<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF ALABAMA

 3                        SOUTHERN DIVISION


 4   ------------------------------------
                                         ) CRIMINAL NO. CR21-00124
 5   UNITED STATES OF AMERICA,           ) COURTROOM 4B
                                         ) U.S. FEDERAL COURTHOUSE
 6                                       ) MOBILE, ALABAMA
     VS.                                 ) AUGUST 11, 2021
 7                                       ) PAGES 1 TO 89, INCLUSIVE
     JUSTIN ADAMS,                       )
 8                                       )
                      DEFENDANT.         )
 9   ------------------------------------)


10

                   SUPPRESSION MOTION (REDACTED)
11            BEFORE THE HONORABLE KRISTI K. DuBOSE
               CHIEF UNITED STATES DISTRICT COURT JUDGE
12

     APPEARANCES:
13

     FOR THE           U.S. Attorney's Office
14   GOVERNMENT:        By:  Michael D. Anderson, Esq.
                        Assistant U.S. Attorney
15                      63 South Royal Street, Suite 600
                        Mobile, Alabama  36602
16

     FOR DEFENDANT JUSTIN ADAMS:
17

                        Hanley Law Firm
18                      By:  Neil Stewart Hanley, Esq.
                        158 Congress Street
19                      Mobile, Alabama  36603


20   FOR SHEILA BROWN WILLIAMS:


21                      Walsh Law, LLC
                        By:  Thomas Walsh, Esq.
22                      1111 Dauphin Street
                        Mobile, Alabama  36604
23

     COURT REPORTER:    Melanie Wilkins, RMR, CRR
24                      Official Court Reporter


25
</pre>

1          Proceedings reported by machine stenography.

2               Transcript produced by computer.

3     [August 11, 2021, 2:31 p.m.  The defendant is present with

4     counsel in open court.]

5          THE CLERK:  We are on the record for a suppression

6     hearing in Criminal No. 21-124, the United States of America

7     versus Justin Lee Adams.

8          What says the Government?

9          MR. ANDERSON:  The United States is ready, Your

10    Honor.

11         THE CLERK:  And the defendant?

12         MR. HANLEY:  The defendant is ready, Your Honor.

13         THE COURT:  Okay.  So, Mr. Hanley, you filed a motion

14    to suppress.  It doesn't have a lot of information in it, but

15    let me just get you to maybe expand on it a little bit here.

16    You want to pull that microphone close to you.

17         MR. HANLEY:  Yes, ma'am.

18         THE COURT:  So two things.  You indicate that all the

19    evidence that was seized as a result of the traffic stop and

20    arrest should be suppressed.  The Government has responded by

21    saying that there was a traffic stop because he ran a red light

22    and then they ran a search and found out he had warrants so

23    they had to arrest him.

24         And then, of course, there was an inventory search of

25    the car.  All right.  You take issue with those facts?

```
 1              MR. HANLEY:  I take issue with it being a proper

 2    inventory search.

 3              THE COURT:  Okay.  So what would you argue would have

 4    been a proper inventory search?

 5              MR. HANLEY:  I believe that --

 6              THE COURT:  Well, first of all, let's make sure.  You

 7    don't take issue that there was a legitimate traffic stop?

 8              MR. HANLEY:  No.  I do not, Judge.

 9              THE COURT:  Okay.  And that he had warrants?

10              MR. HANLEY:  I do not take issue with that.

11              THE COURT:  And that he was legitimately arrested?

12              MR. HANLEY:  I do not take issue with that.

13              THE COURT:  So where do you go --

14              MR. HANLEY:  I believe -- judging by the response of

15    the Government, I believe that they are going to say that he

16    was the sole occupant of the vehicle; thus, when he was being

17    arrested, they were, obviously, going to impound it.  It was on

18    a public street and whatnot.

19              I believe the evidence is that there will be

20    evidence -- and that his girlfriend showed up later and took

21    the vehicle.  I believe there's going to be evidence that she

22    arrived on scene prior to most of the officers who ended up

23    showing up; that when she arrived, he had not yet been

24    arrested; that she informed them that it is her vehicle, she's

25    the registered owner.  It was her intent not to have the
```

1  vehicle impounded; and that, thereafter, after the police

2  learned of this, that they then arrested my client and

3  performed this inventory search when, in fact, there was -- the

4  car was never going to be impounded.  And it was ultimately

5  released to his girlfriend, and she left with it.

6           THE COURT:  Okay.

7           MR. HANLEY:  That's essentially a pre-textual

8  inventory search.

9           THE COURT:  All right.  So we've got what we are

10  looking for there, pre-textual inventory search.  I don't think

11  I have ever heard that, pre-textual inventory search.  Do you

12  have any --

13           MR. HANLEY:  I don't know it that would be the proper

14  name.

15           THE COURT:  Do you have any case law on that or

16  anything?

17           MR. HANLEY:  There's certainly case law, Judge, that

18  says they have to have a proper reason to impound the vehicle

19  and the authority to do it and that's got to be the purpose.  I

20  don't believe that just because somebody is arrested there was

21  anything that says that that --

22           THE COURT:  Okay.  Well, we'll get to that.  The

23  second thing is any alleged statements that were made during

24  the arrest, and the only statements that I know of are the ones

25  that were made to the probation officer a few days later.

1          Are there other statements?

2          MR. HANLEY:  No.  That's the statement I'm referring

3     to, Judge.

4          THE COURT:  Okay.  And you say were elicited during a

5     custodial interrogation.  Tell me what your facts are going to

6     be about that.

7          MR. HANLEY:  Judge, the facts I expect on this one is

8     that my client was -- I don't recall offhand whether he pled

9     guilty.  He was pled guilty in this previous case, which placed

10    him on probation, that this Court ordered him to abide by the

11    rules of probation, that his probation officer, among those

12    rules, says that he must report if he's been arrested.

13          Furthermore, it says that he must show up, he must

14    meet with the probation officer when directed to, and that he

15    must answer all questions truthfully, not that any answers he

16    gave must be truthful or anything like that, just that he must

17    answer all the questions of the probation officer truthfully.

18          And that he had been informed that any violation of

19    these terms could him end up back with a jail sentence with an

20    SRT revocation; that he got out of jail, he abided by it,

21    immediately informed the probation officer.

22          The probation officer directed him to come in; that

23    he came in; that he went over to the courthouse through

24    security through locked doors, sat in a room that, by

25    appearances, had to be unlocked to allow them to even get into

1   it.  He came in and the probation officer questioned him

2   directly about the charges he had received and what had

3   happened.

4          And that, due to his belief that it was -- he was

5   ordered by the Court to answer all these questions, he did so.

6   And he did not feel free to leave.  He did not feel he could

7   get up and walk out any time during the meeting that was

8   directed by a probation officer.  No one warned him that he had

9   any <u>Miranda</u> rights or right not to incriminate himself or that,

10  regardless of what happened, he was going to be able to leave

11  at the end of it.

12         So I think the totality of the circumstances as to a

13  probationer that is under order of the Court and has been told

14  by the Court directly this probation officer is essentially the

15  boss, you have got to do everything they say, you have got to

16  follow the rules.  In that situation, he did not feel that he

17  could leave or that he had any choice to remain silent without

18  violating the terms of his probation or his SRT.

19         THE COURT:  Okay.  Do you disagree with any of the

20  facts that he just gave?  I know you disagree with his

21  conclusion of law, but do you disagree with any of the facts?

22         MR. ANDERSON:  Judge, I'm trying to think about this.

23  I don't agree with any of the facts that he's offered, but --

24  no, I do disagree with the facts.  I'm trying to think about

25  this.  So I do disagree with the facts and, because of that, I

1    think we need to hear from Officer --

2          THE COURT:  Well, which facts do you disagree?  He

3    was called to the probation office, and he went into the

4    probation office.

5          MR. ANDERSON:  And he was interviewed.

6          THE COURT:  Yeah.  That's all he said.  He just made

7    it more dramatic that it's locked doors and stuff, which they

8    are.

9          MR. ANDERSON:  All of that is accurate.  That's why I

10   want to agree with him, but, if there's any force or coercion,

11   I disagree with that.  And he can --

12         THE COURT:  But he's doing that as a matter of law.

13   He's saying because -- my understanding of your argument is,

14   the rules of supervised release say you must answer truthfully

15   all questions posed to you by your probation officer and tell

16   them of any contact you have with law enforcement.  Those are

17   the -- that's what you are saying.  And that is the force

18   that --

19         MR. HANLEY:  As well as the term directing that they

20   must appear and report when directed.  I believe that applies

21   not only to showing up but remaining through the meeting.  I

22   think that's the obvious implication of that.

23         THE COURT:  Well, I think we can dispose of this

24   pretty quickly.

25         MR. ANDERSON:  Yes, ma'am.

1          THE COURT:  I'm sort of intimately familiar with this

2     exact issue before the Eleventh Circuit.

3          MR. ANDERSON:  Yes, ma'am.

4          THE COURT:  Under the McKathan case.  McKathan was a

5     case that a similar argument was made that you are making,

6     Mr. Hanley, and was made somewhat successfully before the

7     Eleventh Circuit.  And they said, well, you know, in the

8     Eleventh Circuit, we know that if they don't answer these

9     questions, then they can be subject to penalty.

10          So that's one of the three situations where a

11     defendant does not have to invoke, you know, his right to

12     remain silent.  One is when he's in custody, which he was not

13     in custody, but, two, where he's having to answer under

14     penalty -- under threat of penalty by the Government.

15          So the Eleventh Circuit said, well, in the exact

16     situation you just described that that is under penalty of

17     being prosecuted if you don't answer.  Then what they said

18     was -- and, besides that, you know, they pointed to an Eleventh

19     Circuit case where someone was actually prosecuted for refusing

20     to answer.

21          Then what happened -- that was in 2016.  In the wake

22     of the Murphy case, which came out of the Supreme Court and the

23     Robinson case out of the Eleventh Circuit, the Sentencing

24     Commission amended their commentary to Sections 5B1.3 and 5D1.3

25     of the U.S. Sentencing Guideline Manual to basically abrogate

1    <u>Robinson</u>, which was the Supreme Court case.

2           And they said there, quote, although the condition in

3    subsection C4 requires the defendant to answer truthfully the

4    questions asked by the probation officer, a defendant's

5    legitimate invocation of the Fifth Amendment privilege against

6    self-incrimination in response to a probation officer's

7    question shall not be considered a violation of this condition.

8           So, basically, they changed it to say, okay, there's

9    no longer a penalty associated with it if you don't answer.

10   That was in 2016.  And <u>McKathan</u> had made the statements before

11   then, so it didn't apply to him.

12          But then the Eleventh Circuit goes on to note that

13   since this application was made effective November the 1st,

14   2016, no supervised releasee who chose or chooses to answer

15   questions after that date could demonstrate that he reasonably

16   believed or believes he was or is faced with the classic

17   penalty situation that <u>Murphy</u> prohibits.  So the Eleventh

18   Circuit has foreclosed your argument on this.

19          Now, you'll be the first to write a footnote to say

20   how many defendants have read this and know that when they go

21   in.  I totally understand your argument, but the Eleventh

22   Circuit has foreclosed that argument as of any statements made

23   after November the 1st of 2016.

24          Do you have another argument that I'm missing?

25          MR. HANLEY:  Judge, it would just be that I take

1   issue with that, that statement by the Eleventh Circuit.

2           THE COURT:  Okay.  Well, you take that up with the

3   Eleventh Circuit then.

4           MR. HANLEY:  Well, I don't know, it almost sounded

5   like dicta to me.

6           THE COURT:  Oh, it was not dicta.  I'll give you the

7   case.  It's --

8           MR. HANLEY:  I've got the case, Judge.

9           THE COURT:  7 -- well, that's my number.  I don't

10  know what their number was.

11          MR. HANLEY:  McKathan case.

12          THE COURT:  Yes.

13          MR. HANLEY:  I've got it, Judge.

14          THE COURT:  Okay.

15          MR. HANLEY:  And I'll just make the argument that a

16  change in a U.S. Sentencing Guideline Manual in no way shows my

17  client specifically or, really, any defendants that this is the

18  case.  I have a little trouble even figuring it out in my head

19  because why do we have Miranda rights.  It's a situation --

20          THE COURT:  Well, that's for custody.  And so this is

21  a penalty situation where he's not in custody.  So --

22          MR. HANLEY:  Yes, ma'am.  I guess it would just be --

23  I'm just applying the same reasoning --

24          THE COURT:  Oh, okay.

25          MR. HANLEY:  -- that they don't really have the right

```
 1   if they don't about it.  He saw terms and conditions that had

 2   nothing about answer all these questions truthfully and, by the

 3   way, you don't have to answer any questions that you think are

 4   going to incriminate yourself and, if you did, invoke that

 5   right, we are not going to revoke you.

 6              THE COURT:  Right.

 7              MR. HANLEY:  Nobody told him that.

 8              THE COURT:  Right.

 9              MR. HANLEY:  They told him, you answer it or you are

10   looking at revocation.

11              THE COURT:  Uh-huh.

12              MR. HANLEY:  And that's what he's operating under.

13              This reminds me a little bit of 1980 --

14              THE COURT:  Now, what you said is different.  You are

15   saying that the probation officer told him something that's

16   different than what was in the guidelines.  The guidelines say

17   you can't be revoked for refusing to answer.  You can be

18   revoked for falsely -- giving a false answer, but the

19   guidelines say you cannot be revoked for refusing to answer.

20              And are you telling me that the probation officer

21   told him something different than that?

22              MR. HANLEY:  I think that what he was originally told

23   as per -- you know, it's been filed with the Court the standard

24   conditions of supervision, the defendant shall answer

25   truthfully all inquiries of the probation officer.  It's never
```

1   told that that is in any way that you have a right not to,

2   that, hey, we've changed this, you can't be revoked if you

3   plead the Fifth.  This is all he's had.  And so,

4   constructively, for all intents and purposes, he was told

5   something different.  He was told if I ask you a question, you

6   have to answer it, and you have to answer it truthfully.

7              THE COURT:  Why don't we introduce those because we

8   are going to go ahead and finish up on this part, and then we

9   are going to go back to your first issue.

10             MR. HANLEY:  You mean an exhibit?

11             THE COURT:  Why don't you make that an exhibit to

12  your argument here.

13             MR. HANLEY:  Judge, I'd offer Exhibit A, Standard

14  Conditions of Supervision, and this is from my client's case.

15             THE COURT:  It's from your client?

16             MR. HANLEY:  Yeah.  I printed it out from the

17  previous SRT revocation.  May I approach?

18             THE COURT:  Yes.  It's admitted.

19             MR. ANDERSON:  No objection, Judge.

20       [Defense A was received in evidence.]

21             THE CLERK:  Do you want to see it?

22             THE COURT:  No.

23             Anything else on this issue because I think this

24  issue could shall can be ruled on as a matter of law, but if

25  you need to put any facts in the case on this issue --

1          MR. HANLEY:  No, ma'am.  I don't think I've got any

2     facts.

3          THE COURT:  Okay.  And you may want to.  I don't

4     know.

5          MR. ANDERSON:  No.  Judge, actually, I can proffer it

6     and I don't think Mr. Hanley will disagree.  Mr. Adams came to

7     see his probation officer on several occasions prior to the

8     date that he came.  I think it was January 21st when he came to

9     see the probation officer.  He came to the office.  He was

10    interviewed by the probation officer, and he left the probation

11    office after -- excuse me -- after the interview.

12          On January 21st of this year, Mr. Adams came to the

13    probation office, was interviewed by Mr. Bedsole, and left the

14    probation office after he was interviewed by Mr. Bedsole.

15          I asked Mr. Bedsole this and I didn't get an answer

16    from him, but he thought -- he was gonna check to see -- he

17    thought that Mr. Adams may have come to the office and seen him

18    after January the 21st, interviewed with him, and left even

19    after January the 21st.  And I think that's important too.

20          THE COURT:  Okay.  Well, there's no -- he went.  He

21    was interviewed.  He said what he thought he had to say, and he

22    left; correct?

23          MR. HANLEY:  Yes.  He left when he was informed by

24    the probation officer that he was allowed to leave.

25          THE COURT:  All right.  Well, I don't find any facts

```
1   that would support a custodial situation, but I do find facts

2   that would support the penalty -- what do they call it?

3   -- classic penalty situation.  But, as I said, the Eleventh

4   Circuit has said that that no longer applies in this situation

5   per McKathan.  I find that your motion to suppress the

6   statements made on I think -- I don't know the date -- the

7   21st of -- anyway, to the probation officer is denied.

8            Now, let's do the -- any evidence you have as to the

9   items or evidence seized on the 16th.

10           MR. ANDERSON:  Yes, ma'am.  Your Honor, the United

11  States would call Officer Aaron Windsor.

12           Judge, may I release Preston Bedsole as a witness?

13           THE COURT:  That's up to you.  You never know.  You

14  never know when something may come up.

15           MR. ANDERSON:  I'll keep him.

16           THE COURT:  Yes, sir.  If you would raise your right

17  hand.

18                    AARON EDWARD WINDSOR,

19       having been first duly sworn, testified as follows:

20           THE WITNESS:  So help me God.

21           THE CLERK:  Okay.

22           MR. ANDERSON:  Your Honor, may I sit at the table or

23  do you --

24           THE COURT:  Yes.

25           MR. ANDERSON:  Yes, ma'am.
```

DIRECT - AARON EDWARD WINDSOR

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MR. ANDERSON: |
| 3 | Q.   Can you please state your name for the record and where |
| 4 | you are employed? |
| 5 | A.   Officer Aaron Edward Windsor, the Prichard Police |
| 6 | Department. |
| 7 | Q.   And how long have you been working for the Prichard Police |
| 8 | Department? |
| 9 | A.   Five years. |
| 10 | Q.   Let me refer you back to January 16th of this year.  Did |
| 11 | you have the occasion to come in contact with Justin Adams? |
| 12 | A.   Yes. |
| 13 | Q.   Do you see him here in the courtroom today? |
| 14 | A.   Yes. |
| 15 | Q.   Could you point him out, please, and describe him. |
| 16 | A.   The young man in the orange outfit. |
| 17 | Q.   Okay.  Now, can you tell the Court what first drew your |
| 18 | attention to Mr. Adams on that day? |
| 19 | A.   I observed a vehicle traveling on Dunlap Circle, run a |
| 20 | blinking red light.  After it had run that red light, it was |
| 21 | moving at a high rate of speed. |
| 22 | Q.   Okay.  Now, we are going to move forward from what -- were |
| 23 | those violations of traffic laws in your belief at that time? |
| 24 | A.   Under the traffic code of 32, yes, sir. |
| 25 | Q.   Okay.  Was that the basis for you making the stop of the |

DIRECT - AARON EDWARD WINDSOR

1  vehicle?

2  A.    Yes, sir.

3  Q.    Okay.  Now, we are gonna move forward from the reason for

4  the stop, and I'm gonna ask you questions just about the stop

5  at this point.  Okay?  Now, where did the vehicle come to a

6  stop?

7  A.    After I initiated blue lights on Wilson and West Turner at

8  the stop sign, the vehicle stopped.  I asked the vehicle --

9  using my loud speaker, I asked the individual inside the

10  vehicle to pull their vehicle over.  There was noncompliance.

11  Still using a loud speaker, this must have went on for about

12  two to three minutes.

13  Q.    When you say there was a noncompliance, what do you mean

14  by that?

15  A.    The vehicle did not pull over.  It remained at that stop

16  sign.

17  Q.    Okay.  And how long did you say this occurred?

18  A.    Approximately two to three minutes.

19  Q.    Okay.  What happened then?

20  A.    Finally, the vehicle, after my last command to pull over

21  to a safe spot, the vehicle then executed a right turn onto

22  West Turner Road.

23  Q.    When it turned onto West Turner Road, what happened at

24  that point?

25  A.    I then alerted our dispatch that I was initiating a

DIRECT - AARON EDWARD WINDSOR

1   signal 11, known as a traffic stop.  I then ran the 28 that was

2   displayed on the vehicle.

3   Q.   The 28 that was displayed on the vehicle, is that the

4   license plate?

5   A.   Yes, sir.

6   Q.   Okay.  So you ran the license plate at that time.  You

7   were in your patrol car right behind the vehicle; is that

8   correct?

9   A.   Yes.

10  Q.   What happens next?

11  A.   I then got out to engage the individual in question.  Upon

12  approach, I asked -- informed the individual my probable cause

13  for pulling him over was running a blinking red light on Dunlap

14  and Wilson, to also include an excessive speed of 30 miles an

15  hour, the posted speed limit on Wilson Avenue.

16  Q.   What happened next?

17  A.   The individual then informed me, he said -- he said, "I

18  know who you are, Chief.  I knew when I seen you that you were

19  not the one to be messing around with," or words to that

20  effect.  I then asked the individual did they have a driver's

21  license.  He answered in the negative.  I asked then for his

22  Social Security number, which he gave voluntarily.

23        I then went to my vehicle and ran that Social

24  Security number.  While inside the vehicle, I was alerted by

25  dispatch that the individual in question had active felony

DIRECT - AARON EDWARD WINDSOR

1   warrants.  I then requested back-up.

2   Q.   Okay.  So when you requested back-up through dispatch or

3   over your radio, what happened next?  What did you do next?

4   A.   I stayed in my position, still observing the individual,

5   meaning even though I couldn't see through the rear -- the back

6   area because of the tint and so forth, I just did overwatch

7   just to make sure everything was all right until my back-up

8   arrived.

9   Q.   Do you have any idea how long it took the back-up to

10  arrive?

11  A.   I do not.

12  Q.   When the back-up arrived, what did you do?

13  A.   I dismounted from my vehicle.  I then went up to the

14  vehicle and informed him by his name, "Mr. Adams, I need you to

15  step out of the vehicle.  You have active felony warrants."  He

16  stepped out of the vehicle voluntarily.  I then detained him in

17  reference to the active felony warrants that he had upon him.

18  A Terry pat-down was conducted for everybody's safety and so

19  forth.  I then took him to my vehicle and placed him in the

20  back of my vehicle.

21  Q.   Was he placed in handcuffs at that time?

22  A.   Once again, he was detained.  He was handcuffed, yes.

23  Q.   You placed handcuffs on him when you detained him at his

24  vehicle?

25  A.   At his vehicle, exactly.

DIRECT - AARON EDWARD WINDSOR

1   Q.   Okay.  All right.  And then he was placed in the back of

2   your vehicle?

3   A.   Yes, sir.

4   Q.   When he was placed in the back of your vehicle, what

5   happened next?

6   A.   I was alerted by Officer Williams -- who was the first one

7   to arrive on scene that gave me the overwatch before I engaged

8   Mr. Adams and gave overwatch in reference to the whole

9   situation.  He alerted me that he saw a weapon in the front

10  right passenger seat.

11  Q.   Okay.  Let me ask you this:  When back-up arrived, do you

12  know who the back-up was that arrived to help you initiate this

13  arrest of Mr. Adams?

14  A.   That was Officer Chase Williams.

15  Q.   When he arrived, where was he located?  Where his vehicle

16  and where was Officer Williams?

17  A.   I was standing at an angle with Mr. Adams and Williams to

18  my immediate left.

19  Q.   Okay.

20       THE COURT:  And so you had already arrested

21  Mr. Williams at this point?

22       THE WITNESS:  No.  I had not arrested him.

23       THE COURT:  You had gotten him out of the vehicle?

24       THE WITNESS:  Exactly, while Officer Chase Williams

25  was there.  That's for my protection and everything.  I try not

DIRECT - AARON EDWARD WINDSOR

1   to engage anybody that may have an active felony warrant by

2   myself.

3         THE COURT:  Right.  So you waited until somebody got

4   there.  And then you walked back, and then you said, "Hey, you

5   have a felony warrant.  Get out."  And he did, and you arrested

6   him?

7         THE WITNESS:  That's affirmative, Your Honor.

8         THE COURT:  And the other guy, Mr. Williams, Officer

9   Williams, is it at that point he saw the gun in the car?

10        THE WITNESS:  Negative.

11        THE COURT:  Okay.

12  BY MR. ANDERSON:

13  Q.   I'm trying to think about this.  So you placed Mr. Adams

14  in the car.  Officer Williams tells you that he sees a firearm

15  in the car; is that correct?

16  A.   So there's no miscommunication, I walked him to my vehicle

17  and placed him in my vehicle.  Williams was behind me or

18  whatever.  He must -- he went to the vehicle, and then that's

19  when he alerted me, after I placed Mr. Adams in the back of the

20  patrol car, that he saw a weapon in the front right seat.

21  Q.   Okay.  Let me ask you this:  At this time Mr. Adams wasn't

22  free to go?  He was under arrest for the active felony

23  warrants?

24  A.   Yes.

25  Q.   Okay.  Did you have any intention with the vehicle at this

DIRECT - AARON EDWARD WINDSOR

1   time; or what was your intention with the vehicle?

2   A.   The intention of the vehicle based on him not having a

3   driver's license, that vehicle can be towed.

4   Q.   Was it going to be towed?

5   A.   Yes, it was gonna be towed.

6   Q.   Now, what did you do in that respect?

7   A.   I then alerted our dispatch that I needed what we call

8   740, which was Pitts & Sons, to come to the location to take

9   control of the vehicle because he did not have a valid driver's

10  license.

11          THE COURT:  If he had a valid driver's license, what

12  would you have done differently?

13          THE WITNESS:  Then the vehicle would have still -- we

14  would have reached out to Mr. Adams and said, "Hey, can you

15  have somebody come pick up this vehicle on your behalf because

16  you are getting ready to be taken over to Mobile Metro," Your

17  Honor.

18          THE COURT:  All right.  So is this a standardized

19  policy, written policy, that if they don't have a driver's

20  license, you do it one way, but if they do have a driver's

21  license, you do it another way?

22          THE WITNESS:  Go ahead and rephrase your question

23  again, Your Honor.

24          THE COURT:  Okay.  Is it standardized policy that if

25  they have a driver's license, then you proceed this way, and,

DIRECT - AARON EDWARD WINDSOR

1   if they don't have a driver's license, you proceed --

2           THE WITNESS:  It's officer's discretion on how they

3   want to do that situation.

4           THE COURT:  Okay.

5           THE WITNESS:  All right.

6           THE COURT:  All right.  So why -- whether he has a

7   driver's license, why does that make a difference?

8           THE WITNESS:  Because he's -- No. 1, he shouldn't be

9   out on the roads.  Now, before this even happened, I was

10  alerted that there was a weapon inside of the vehicle.  All

11  right?

12          THE COURT:  Okay.

13          THE WITNESS:  So I made the call that I did based

14  upon the totality of the information that I had in front of me.

15          THE COURT:  Not just based on the fact that he didn't

16  have a driver's license?

17          THE WITNESS:  Exactly, ma'am.

18          THE COURT:  So Officer Williams, after you put him in

19  the car, said, "Hey, there's a gun on the back" --

20          THE WITNESS:  On the front right passenger seat, Your

21  Honor.

22          THE COURT:  Front right passenger seat.  Okay.  And

23  at that point what happened?

24          THE WITNESS:  With that being said, Your Honor, I

25  then went to the vehicle.  The door was shut.  I opened up the

DIRECT - AARON EDWARD WINDSOR

1    door, and, lo and behold, there was a weapon in the front right

2    seat.  I alerted dispatch that I had a weapon in the front

3    right seat, to stand by for the serial number.  Any weapon that

4    we find, we will run the serial number to make sure that it

5    either isn't stolen and/or find out who the owner is and so

6    forth.  I then ran the serial number.

7    BY MR. ANDERSON:

8    Q.   What do you do to run a serial number?

9    A.   I just read off the serial number on the weapon.

10   Q.   Did you take the weapon?

11   A.   Yes, I did.

12   Q.   Okay.

13   A.   And read the serial number with the make and type of the

14   weapon.  After that, I was informed by dispatch that the weapon

15   come back as "not on file."  I say again, "not on file."

16   Q.   What does that mean?

17   A.   That means that there is nobody that can claim ownership

18   to that weapon.

19   Q.   Okay.  So after they came back and said that the weapon

20   was not on file, what did you do with the weapon?

21   A.   I put the weapon in a safe position, took the magazine

22   out, and discovered that there was one round hot in the

23   chamber.

24   Q.   Okay.  And what did you do with the weapon and the

25   magazine and the rounds at that time?

DIRECT - AARON EDWARD WINDSOR

1   A.   I then made sure that I had possession of it.  I laid it

2   on the hood of my vehicle.  I then walked over to Mr. Adams and

3   inquired did he know anything about the weapon.  There was a

4   nonresponse from Mr. Adams in reference to ownership of that

5   weapon.

6   Q.   Okay.  He didn't respond when and whether he knew about

7   the weapon?

8   A.   He didn't say.

9   Q.   Okay.  So, while this is going on, who all is at the

10  vehicle with you?  Who all else is present around --

11  A.   My recollection, my recollection is it was just me and

12  Williams at that point.

13  Q.   Okay.  Was there anyone else?  Were there any civilians or

14  anyone else around?

15  A.   No.

16  Q.   Okay.  So, after you placed the weapon on the hood of your

17  vehicle, I need to be real specific, when did you request from

18  dispatch that a tow truck be called out or that the vehicle be

19  towed?

20  A.   Once again, after I discovered that -- No. 1, after I

21  found out that there was a weapon, all right, and, No. 2, is

22  that, once again, we had it validated that he didn't have a

23  driver's license, and, No. 3, he had active felony warrants.

24  Q.   Okay.  So it wasn't until you found the weapon that you

25  requested dispatch to call a tow truck?

DIRECT - AARON EDWARD WINDSOR

1    A.    As far as I can recollect.

2    Q.    Okay.  So, after you placed the weapon on the hood of the

3    vehicle, what do you do next?

4    A.    Once again, I engaged Mr. Adams.  Now, with that being

5    said, with no answer and Pitts & Sons coming, I have to

6    inventory the vehicle and the contents within.

7    Q.    Okay.

8              THE COURT:  Pursuant to what?

9              THE WITNESS:  Because -- in pursuant to what, Your

10   Honor, is that we do an inventory of the vehicle so that when

11   it was taken, nobody can come back later on and say

12   something --

13             THE COURT:  Oh, I know why.  Is there a written

14   policy that you follow or --

15   BY MR. ANDERSON:

16   Q.    Does Prichard have a written policy, do you know, or is it

17   just something that the officers do?

18   A.    It's what the officers do for clarity, transparency, and

19   so forth.

20   Q.    Okay.  Do you know if Prichard has a written policy about

21   this?

22   A.    I am not familiar with that.

23   Q.    Okay.  Earlier, when you and I were talking, you talked

24   about there's a procedure for doing an inventory of the

25   vehicle.  Can you just briefly tell the judge what your

DIRECT - AARON EDWARD WINDSOR

1  procedure is for doing an inventory of a vehicle?

2  A.   My procedure is I check the entire vehicle.  Through my

3  training, there are six quadrants.  I start at the driver's

4  front left side and check the area.  Upon checking Quadrant 1

5  is when I noticed in plain view a bag, a plastic bag.  With

6  that being said, it was in plain view behind the driver's seat

7  and in the passenger back seat compartment area, floorboard

8  area.

9          Upon inventorying or looking inside of that bag is

10 when I discovered what looked like and smelled like a green

11 leafy substance that appeared to be that of marijuana, later to

12 be weighed at approximately 22.2 grams of marijuana.

13 Q.   Okay.  Was there anything else in the bag besides the

14 marijuana?

15 A.   There was a -- what we call a digital weigh scale that was

16 used to weigh assorted-type drugs.

17 Q.   Now, just real quick, did you continue to search the rest

18 of the vehicle?

19 A.   Yes.

20 Q.   Using the quadrants?

21 A.   I went to Quadrant No. 2.

22 Q.   3?

23 A.   I went 3, 4, 5, and 6.

24 Q.   Was there anything else of note in any of the other

25 quadrants of the vehicle?

DIRECT - AARON EDWARD WINDSOR

1   A.    No, sir.

2   Q.    Okay.  At some time around January 16th -- I'm going to

3   show you what's been marked as Government's Exhibit No. 4 for

4   identification purposes.

5         Stewart, do you have a copy of that?

6         MR. HANLEY:  What are we looking at?  I'm sorry.

7         MR. ANDERSON:  It's this one, No. 4.

8         MR. HANLEY:  I've got no objection.

9         THE CLERK:  Do you have a copy for the Elmo?

10        MR. ANDERSON:  Yeah.  I'll walk back to the Elmo.

11  BY MR. ANDERSON:

12  Q.    I'm going to show you Government's Exhibit No. 4.  Do you

13  recognize this photograph?

14  A.    Yes.

15  Q.    Did you take this photograph?

16  A.    Yes.

17  Q.    Okay.  Across the top of the photograph, this is

18  Government's Exhibit No. 4, there's a number.  Is that the case

19  number, the Prichard case number?

20  A.    Yes.

21  Q.    Okay.  Down below the case number, can you tell the judge

22  what you are looking at?

23  A.    If I was to start to my left and work my way over to the

24  right starting up under where it says "No. 2" is the green

25  leafy substance, 22.2 grams of marijuana.

1          No. 2 is a digital weigh scale.

2          No. 3 is the uniform traffic citation known as a UTC

3   for the traffic infraction of running a red light.

4          Underneath all that -- correction on that.

5   Underneath that UTC is the Dollar Tree bag.  Under the digital

6   weigh scale is the probable cause sheet known also as a

7   transport sheet for individuals having an infraction before

8   they are transferred to Mobile Metro.

9          Underneath that is the actual weapon that was found

10  in plain view, right front seat.

11         Next to that to the immediate left is 13 silver

12  casing rounds, .40 caliber.

13         Right next to that to the far -- and up above that is

14  the actual magazine itself.

15         THE COURT:  The magazine was in the gun?

16         THE WITNESS:  Yes, it was.

17  BY MR. ANDERSON:

18  Q.   And I believe you indicated there was one round in the

19  chamber?

20  A.   Hot in the chamber, yes, sir.

21         MR. ANDERSON:  We offer Government's Exhibit No. 4,

22  Your Honor.

23         MR. HANLEY:  I've got no objection, Judge.

24         THE COURT:  It's admitted.

25

DIRECT - AARON EDWARD WINDSOR

1           [Government 4 was received in evidence.]

2                THE CLERK:  I've got it.

3                MR. ANDERSON:  You've got one?

4                THE CLERK:  I've got my copies.

5                MR. ANDERSON:  No further questions at this time,

6    Judge.

7                THE COURT:  Okay.  I have a couple of questions

8    before you start.

9                MR. HANLEY:  Yes, ma'am.

10               THE COURT:  So when did the girlfriend show up?

11               THE WITNESS:  I'm glad you asked that.  She showed up

12   somewhere along the line -- I don't remember how many minutes

13   or so forth.  Somewhere along the line the girlfriend showed up

14   and requested that she receive that car.

15               THE COURT:  Uh-huh.

16               THE WITNESS:  My supervisor, who was on duty at that

17   time, a discussion must have had transpired, and I was asked to

18   release that vehicle to her, to allow her to have her freedom

19   of movement, something about her children and so forth.  And

20   that's why the car was released.  And I'm glad you mentioned

21   that.  I then contacted dispatch and told them to cancel the

22   call in reference to towing the actual vehicle itself.

23               THE COURT:  Had you already searched it?

24               THE WITNESS:  I had already searched it, yes, ma'am.

25               THE COURT:  When your supervisor told you to release

DIRECT - AARON EDWARD WINDSOR

1   it?

2            THE WITNESS:  Yes.

3            MR. ANDERSON:  So I apologize, Judge.

4   BY MR. ANDERSON:

5   Q.   So you indicated that you and Officer Williams were there

6   initially, and Officer Williams was with you when you searched

7   the car initially.  Do you have any idea when your supervisor

8   arrived?

9   A.   It was somewhere after I had run the serial number of that

10  weapon is when he showed up because, once again, I can't

11  recollect if he was on another call along with Officer Jones,

12  but they would later arrive on scene.

13  Q.   Okay.  But you indicated that you had already done an

14  inventory of the car?

15  A.   That's correct.

16  Q.   Before your supervisor -- or before you realized that

17  Mr. Adams's girlfriend arrived on the scene?

18  A.   Rephrase your question or say your question over again.

19  Q.   You had already done an inventory of the car before

20  Mr. Adams's girlfriend was on scene?

21  A.   You are right.  Yes, sir.

22            MR. ANDERSON:  Okay.  No further questions, Judge.

23            THE COURT:  Mr. Hanley.

24            MR. HANLEY:  Thank you, Judge.

25

CROSS - AARON EDWARD WINDSOR

1                          **<u>CROSS-EXAMINATION</u>**

2    BY MR. HANLEY:

3    Q.    Officer, did y'all have any sort of video of this

4    incident?  Body cam?  Dash cam?

5    A.    No.

6    Q.    Did y'all not have them available, or did it just not get

7    recorded?

8    A.    I have my own personal body camera that I've had since

9    2016 when I hit the streets.  With all of that being said,

10   there was an incident that must have happened last year or the

11   year before last and anybody that had a body camera was told,

12   that until further training was conducted, that all personal

13   body cams would not be used.

14             As a matter of fact, I was just released yesterday or

15   the day before yesterday to allow me to use my own personal

16   body cam.  So, once again, nobody in the City of Prichard had

17   body cams unless you physically owned one, paying out of your

18   own pocket.

19   Q.    Okay.  So, on this evening, y'all didn't have any body

20   cams or dash cams; is that what you are saying?

21   A.    I have a dash cam, but it was not activated.

22   Q.    Is there any reason it was not activated?

23   A.    It's my own personal dash cam.

24   Q.    So there's no video of this incident at all?

25   A.    No.

CROSS - AARON EDWARD WINDSOR

1   Q.   Now, this was back in January, I think January 16th,

2   when this happened.  And this occurred at night; right?

3   A.   Yes.

4   Q.   About 9:00 o'clock?

5   A.   Whatever time is on the report.

6   Q.   But it was well dark; right?

7   A.   Yes.

8   Q.   And you first -- and this happened -- this is in Prichard,

9   not too far from Viger School; right?

10  A.   No.  This was out near Gulf Village/Alabama Village when

11  we first made contact, meaning seeing the infraction which led

12  to the stopping of the vehicle.

13  Q.   If I could just show you Defendant's Exhibit B.  Is this

14  where that happened, that Turner Road?  I believe this would be

15  Wilson.

16  A.   This is where he stopped at the stop sign where I

17  initiated blue lights, and he stopped at the stop sign.

18  Q.   Okay.  So you had come into contact with him.  You saw him

19  prior to that, you said, speeding and making a right-hand turn

20  at a blinking red light without stopping; right?

21  A.   On Dunlap Circle and Wilson Avenue, which is approximately

22  a mile and a half down the road.

23  Q.   And then y'all came down -- y'all came down here and

24  this -- there's a stop sign on this corner; right?

25  A.   Yes, four-way stop.

CROSS - AARON EDWARD WINDSOR

1   Q.   Four-way stop.  And you pulled -- my client stopped at the

2   stop sign?

3   A.   I initiated blue lights at that stop sign.

4   Q.   And he was stopped there?

5   A.   Yes.

6   Q.   So big bright blue lights?  You turn on your siren?

7   A.   No.

8   Q.   Big bright blue lights.  You get over the intercom, and

9   you start telling him -- and you start telling him to pull

10   over; right?

11   A.   Yes.

12   Q.   Pull over the right?  Were you telling him through your

13   speaker system to -- were you telling him through your speaker

14   system to pull off the road?

15   A.   Yes.

16   Q.   And, you know, I've read your report.  I heard you

17   testify.  You said you had to do that multiple times?

18   A.   Yes.

19   Q.   And he seemed to not be responding and that you did it

20   for, like, two or three minutes or something like that?

21   A.   Yes.

22   Q.   And, in this area of Prichard, this is a pretty high-crime

23   area; is that right?

24   A.   What do you mean by that question there, sir?

25   Q.   I don't know.  It's often testified in court that certain

CROSS - AARON EDWARD WINDSOR

```
1   areas are high-crime, high levels of crime and police may be a

2   little more alert because of that.  This was one of those sorts

3   of areas, wasn't it?

4   A.   If that's your opinion.

5   Q.   I'm just asking if it's your opinion.

6   A.   I don't offer --

7           MR. ANDERSON:  Objection, Your Honor.  Relevance.

8           THE WITNESS:  That's a biased question to ask me.

9           THE COURT:  Okay.  Well, you don't get to decide

10  whether he can ask you the question or not.

11          THE WITNESS:  I understand, Your Honor.

12          THE COURT:  If you can answer it, you need to answer

13  the question.

14  BY MR. HANLEY:

15  Q.   So this vehicle had a dark back window?

16  A.   Yes.

17  Q.   Very dark.  You couldn't see what was going on in the

18  vehicle, who was in there or anything like that?

19  A.   Yes.

20  Q.   And then after two or three minutes of you talking --

21  y'all are sitting essentially at a stand-off.  Y'all are at a

22  stop sign.  He's in front of you.  You initiated your blue

23  lights.  You keep telling him to pull over and it's not

24  happening?

25  A.   Yes, sir.
```

CROSS - AARON EDWARD WINDSOR

1    Q.    So at some point he takes a right, right here onto West

2    Turner, headed west; is that correct?

3    A.    He pulls off at that area as dictated.

4    Q.    So both of y'all take this turn, and you pulled in behind

5    him?

6    A.    Yes.

7    Q.    And, as standard procedure, you are communicating back

8    to -- back to your department or dispatch letting them know

9    where you are, you've got an individual pulled over and you

10   start running the tag on the vehicle?

11   A.    Yes.

12   Q.    And that's to ensure officer safety so that you know what

13   you are coming into, so that you can match whether the driver

14   is the owner of the vehicle, whether the vehicle is stolen,

15   whether the driver may have warrants, or had a violent history,

16   anything like that; right?

17   A.    Yes.

18   Q.    So, at that point, before you ever come into contact with

19   my client, you realized that this vehicle is registered to a

20   lady, a female?

21   A.    I ran the tag, and it said it come back to an individual.

22   Q.    Do you remember who it was?

23   A.    I cannot recollect.

24   Q.    Okay.  Now, at that point you said you get out of the

25   vehicle, 9:00 o'clock at night, middle of Prichard.  I'm

CROSS - AARON EDWARD WINDSOR

1   presuming you've got your flashlight?

2   A.   I had my spotlight.

3   Q.   Is that a hand-held spotlight?

4   A.   It's a spotlight on my vehicle.

5   Q.   Did you have a hand-held flashlight?

6   A.   Spotlight on the vehicle, sir.

7   Q.   No.  I'm just asking if you had a hand-held flashlight.

8   A.   No.

9   Q.   So when you approached the vehicle, did you have a

10  flashlight in your hand?

11  A.   No, sir.

12  Q.   So you approached this vehicle.  At this point you are in

13  Prichard.  It's 9:00 o'clock.  It hasn't stopped right away.

14  Those sorts of indications are the type of thing that gives an

15  officer pause, isn't it, and makes them be a little careful

16  approaching a vehicle?

17  A.   Yes.

18  Q.   All right.  So when you are approaching the vehicle, you

19  are really paying attention here.  You are paying attention,

20  trying to figure out who may be in the vehicle, is there

21  someone in the back of the vehicle waiting to ambush me.  So

22  you are paying really close attention to this; right?

23  A.   I'm being alert.

24  Q.   And how long have you been an officer?

25  A.   Five.

CROSS - AARON EDWARD WINDSOR

1    Q.    And, before that, you had 29 years as a noncommissioned

2    officer in the Army?

3    A.    Yes.

4    Q.    Got up to first sergeant?

5    A.    Yes.

6    Q.    And so you pay a lot of attention to detail and things

7    like that?

8    A.    Yes.

9    Q.    So, when you approached this vehicle, one of the big

10   things you do when you approach a vehicle, particularly at

11   night in an area like that is you are paying attention to

12   what's in the cab of that vehicle?

13   A.    Yes.

14   Q.    And a big reason is you don't want to get hurt or shot;

15   isn't that right?

16   A.    I am alert of my surroundings.

17   Q.    And you've been trained when you go to a vehicle to look

18   for firearms in the immediate vicinity of the driver, haven't

19   you?

20   A.    No.  It was a simple traffic stop.  There was nothing

21   nefarious at that point, even though he did not comply and not

22   move the vehicle off to the side of the road for that time

23   lapse and so forth.

24   Q.    So when you --

25   A.    It's a traffic stop.

CROSS - AARON EDWARD WINDSOR

1    Q.    When you approached to identify him, you weren't looking

2    in the cab of that vehicle?

3    A.    No, negative.  I was at an angle, meaning when I

4    approached with my spotlight on the vehicle, it's well-lit.  So

5    I don't need a flashlight.

6    Q.    So you can -- I'm sorry.  Go ahead.

7    A.    And I walk up at an angle, the way the training is, to

8    prepare for anything, but it was a simple traffic stop.  I'm

9    not looking for a weapon.  I'm there to engage the individual

10   and let them know what their infraction was, have a discussion,

11   and see if it warrants a ticket or not.  That's what this was

12   about.

13   Q.    That spotlight on your vehicle, that's a big bright

14   spotlight that's on the side; right?

15   A.    Uh-huh.

16   Q.    Did you feel like that that properly illuminated the

17   vehicle --

18   A.    What I could see is it hits the side mirror on the

19   driver's side.  It doesn't illuminate the angle that I had for

20   the entire back of the vehicle because, once again, even then,

21   if it is illuminated, you had tint.  You wouldn't have been

22   able to see inside the vehicle anyway.  Once again, the intent

23   was to engage the individual because they had a moving

24   violation and not to look for ulterior motives to try to do

25   something that was --

1   Q.   No, that was -- and I'm not alleging that.  I'm just

2   wondering if, for officer safety, when you approached my

3   client's vehicle, if you surveyed the immediate area around him

4   to ensure that he was safe and that there weren't any open

5   weapons, guns, and that you were able to look in and see?

6   A.   I'm at an angle.  I can't look in the compartment at no

7   point.  I am at an angle.  I don't know how I can describe it,

8   Your Honor, but this is the driver's side right here.  I'm

9   looking at him.  I'm at an angle like this.

10          So I had no opportunity to -- because one of the

11   worst things you can do is walk up to an open compartment where

12   the driver is sitting there and I'm standing right there in

13   front of him.  That's where you can get in trouble.  That's

14   where somebody can grab you by the necktie, grab you by the

15   collar.  So at no point was I able to see, oh, I see weapon,

16   even with darkness and so forth, Your Honor.

17          THE COURT:  Okay.

18   BY MR. ANDERSON:

19   Q.   Okay.  You walk up to him.  Y'all talk.  You find out he

20   doesn't have a license on him.  At that time, he asked whose

21   vehicle it was; right?

22   A.   No, I did not.

23   Q.   You didn't ask him --

24   A.   No.  I just asked him -- I said, "My probable cause of

25   pulling you over is running a red light, a blinking red light,

CROSS - AARON EDWARD WINDSOR

1  exceeding the 30 mile-an-hour speed limit on Wilson Avenue.  Do

2  you have a driver's license?"

3         His reply was "No."

4         I said, "Do you have -- can I get your Social

5  Security number."  That's when he gave it voluntarily.

6  Remember, before that engagement -- before that, before I even

7  asked him, to give him my probable cause, he stated, "Hey,

8  chief, I know you.  And I knew when I saw you not to mess with

9  you.  You are not the one to mess around with," or words to

10  that effect.

11         So, once again, it was just to do the traffic stop

12  and send the young man on his way.

13  Q.   And, when you were talking to him before you took his --

14  you got the information from him and you were gonna head back

15  to your vehicle to run his information and he asked you at that

16  point if he could smoke a cigarette, didn't he?

17  A.   Not that I can recollect.

18  Q.   Did he ask you -- did he tell you it's his girlfriend's

19  car and did he ask if he could call her, couldn't he?

20  A.   Not that I can recollect.

21  Q.   Do you recollect one way or the other?

22  A.   I don't recollect those questions being asked of me.

23  Q.   You went back to this vehicle.  You sit in it at that

24  time.  And you start running his information?

25  A.   Yes.

CROSS - AARON EDWARD WINDSOR

1  Q.   And it wasn't until you got in there, ran it, and saw the

2  warrants that you called for back-up?

3  A.   Yes.

4  Q.   Now, during this time, didn't his girlfriend pull up on

5  scene in a vehicle and actually come out into the road too

6  where you had to get on your loud speaker and tell her to get

7  out of the road?

8  A.   Not that I can recollect.

9  Q.   You don't remember when she showed up at all?

10 A.   Once again, I was doing the vehicle.  If she showed up on

11 scene, the only time you see in my report that I remember me

12 being on scene is when I was engaged by certain -- the

13 supervisor to release the vehicle.  Please look at that report.

14 And at no point did I say she arrived on scene before back-up

15 or when back-up arrived.  That would have been depicted in my

16 report.  And the vehicle would have been immediately released

17 to her.

18         Now, she may have engaged somebody else, but she

19 didn't engage me once she arrived on scene.  But at no point do

20 I ever remember her engaging me personally and saying can I get

21 that vehicle.  She had a conversation with somebody else.  I

22 was just -- I was inventorying the vehicle.

23 Q.   So you believe she had a conversation with somebody else?

24 A.   Whenever she arrived, she had a conversation with

25 somebody, and it was not me.

CROSS - AARON EDWARD WINDSOR

1  Q.   And, earlier, you testified that she arrived after the

2  search, but you are saying you don't know when she got there;

3  right?

4  A.   I don't know when she got there.

5  Q.   So after you take my client -- you didn't arrest him until

6  the other officers got there?

7  A.   The back-up, right.

8  Q.   Your own back-up.  And who was your immediate back-up when

9  you reapproached the car to take my client out of it?

10  A.   Okay.

11  Q.   Who was then -- who were the other officers when you went

12  to remove my client?

13  A.   I don't know when the other officers arrived on the scene.

14  When I started inventorying the vehicle, it was just me and

15  Officer Chase Williams.

16  Q.   That's who I'm talking about, sir.

17  A.   Yes, sir.

18  Q.   That's what I'm trying to nail down.

19  A.   Uh-huh.

20  Q.   After Officer Chase Williams arrived, that's when you said

21  you removed my client from the vehicle, placed him under

22  arrest.  Where was Officer Williams when that happened?

23  A.   Once again, he was to my left of the driver's door.

24  Q.   Okay.  And y'all go back.  You take my client to the

25  vehicle, and then you say that Officer Williams tells you

CROSS - AARON EDWARD WINDSOR

1  there's a gun -- he had walked back over to the car; right?

2  A.    Yes.

3  Q.    And walked over to the passenger side?

4  A.    He alerted me that he found a weapon in the vehicle.

5  Q.    Do you know the circumstances of how he found that weapon

6  or was alerted to that weapon?

7  A.    Yes, sir.  He said that he found a weapon in the front

8  right seat.  There was a weapon -- or correction.  There was a

9  weapon in the vehicle.

10 Q.    Have you reviewed your report on this?

11 A.    Yes, I have.

12 Q.    Do you recall anywhere in there stating that Officer

13 Williams was the one that initially discovered this before the

14 inventory search?

15 A.    Yes.  I haven't even done an inventory yet.

16        MR. HANLEY:  If I could have one second?

17        THE COURT:  Let me ask you a question.  This is going

18 back to your inventorying of the car.  Once you -- you said you

19 had discretion whether to have the car towed or to give it to

20 somebody else.  And at that point you had decided that it

21 needed to be towed.

22        Now, after you make that decision, is it -- do you

23 have a standard policy about what you are supposed to do?

24        THE WITNESS:  I can't recall there, ma'am, meaning we

25 have standard operating procedures, and I go through it with a

CROSS - AARON EDWARD WINDSOR

1    fine-tooth comb.  I would have to go back and research that.

2            THE COURT:  Yeah.  I'm not asking you to tell me

3    verbatim or anything.  What I'm asking is, is there a procedure

4    that you must follow before you let the tow truck pick up the

5    car?

6            THE WITNESS:  Yes.  There's a certain procedure that

7    we, most officers in Prichard, follow based upon officer

8    discretion and given the ability to -- for individuals to

9    obtain -- get that vehicle --

10           THE COURT:  No.  Listen to my question.  This is

11   after you have called the tow truck.  Is there something you

12   have to do before you can release the car to the tow truck?

13           THE WITNESS:  Yes.  You have to do an inventory.

14           THE COURT:  Okay.  And that's pursuant to a standard

15   policy?

16           THE WITNESS:  Yes, ma'am.  Well, that's pursuant

17   to -- I can't recollect our policy, if we have that in there,

18   but we do it for --

19           THE COURT:  I know why you do it.  I'm just saying is

20   that required.  I mean, you can't just let the car -- or does

21   Prichard allow a tow truck to just pick up the car?

22           THE WITNESS:  No, we don't just allow.  There's

23   certain protocols that we go by, and also, when we contact our

24   dispatch and so forth, we annotate -- we have them annotate on

25   the screen, like if something is found like, you know, money.

CROSS - AARON EDWARD WINDSOR

1   So nobody can go back and say that officer stole my money.  You

2   know what I'm saying?

3          THE COURT:  So I'm just trying to get to what are the

4   procedures once you have called a tow truck?  What are you

5   supposed to do?

6          THE WITNESS:  Inventory the vehicle.

7          THE COURT:  Okay.  And you know -- you've been taught

8   like how you are supposed to go about doing that.  Like, some

9   police departments are like you just, you know -- if there's a

10  box, you just take -- you know, you see a box.  You don't open

11  the box and go all the way through it.

12         THE WITNESS:  Huh-uh.

13  BY MR. ANDERSON:

14  Q.   What does your department do?

15  A.   We just go through the contents to make sure that whatever

16  we see that it's annotated.  Like I said, if it's a pair -- we

17  just want it to say in reference to this situation.

18         THE COURT:  Do you do it at the scene?

19         THE WITNESS:  Oh, yeah.  Now, if we come across

20  something nefarious, we stop.  We get hold of a detective, and,

21  if a warrant needs to be issued to search that vehicle, there

22  are certain things that will stop it.  You know what I'm

23  saying?  I mean correction.  I didn't mean to say it that way.

24  But there are certain things that we will not cross the

25  threshold to have the fruit of a poisonous tree type issue.

CROSS - AARON EDWARD WINDSOR

```
1              THE COURT:  And, well, you found marijuana, but that
2    didn't -- you didn't call a detective in for that.
3              THE WITNESS:  No.
4              THE COURT:  You are talking like if you found a
5    murder weapon or something like that?
6              THE WITNESS:  Right.
7              THE COURT:  Okay.  All right.
8              Go ahead.
9              THE WITNESS:  Now, I have had the situation where I
10   found a lot of dope and cocaine and stuff like that.
11             THE COURT:  And you called --
12             THE WITNESS:  I stopped.  I called a detective.  All
13   right?  And let them make that decision if the search can
14   continue and if we needed a warrant.
15             THE COURT:  Okay.
16   BY MR. HANLEY:
17   Q.   And just to follow up on that.  That's kind of your
18   personal standard operating procedure, not necessarily the
19   official procedure of Prichard?
20   A.   That is mine.  I can only vouch for what I do.  That is my
21   standard procedure that was cultivated into me since Day No. 1
22   putting on this badge and working for the City of Prichard.
23   Q.   Okay.  So you filled out your offense report.  You would
24   have done this pretty contemporaneously with this incident;
25   right?
```

CROSS - AARON EDWARD WINDSOR

1   A.   Yes, sir.

2   Q.   And you are obviously super-detail oriented, and you know

3   that it's very important to put every important detail in this

4   document?

5   A.   As much as I can remember and -- yes.  But, yes, I do the

6   best I can when I'm writing a report.  That's the way I'll

7   answer that question there, sir.

8   Q.   Okay.  And you wrote a narrative of this, right, not just

9   the plain "we arrested him for this."  You wrote down what

10   happened?

11   A.   Yes.

12   Q.   I'm going to show you what I've marked as Defendant's

13   Exhibit C.  Does this appear to be your narrative?

14   A.   That is my narrative, yes.

15   Q.   I'm not sure how to do this.  Okay.  Have you reviewed

16   this?  Do you need to review this front page?  I'm not asking

17   anything about this.

18   A.   I reviewed it.

19   Q.   Okay.  Now, what I'm going to ask you about specifically

20   and I'll tell what you we are looking for is where you said

21   that Officer Williams saw this in plain view and that's what

22   alerted you to it prior to the inventory search.  Okay?

23   A.   Uh-huh.

24   Q.   If you want to tell me when you are done with page 1.

25   A.   I'm done with page 1.  There's nothing on that report that

1  says he alerted me.  So?

2  Q.    What this says, "I required Mr. Adams to exit the vehicle

3  where he was taken to my vehicle.  The vehicle was inventoried.

4  During the inventory, a Smith and Wesson was found in plain

5  view during the inventory."

6  A.    Uh-huh.

7  Q.    But you never mentioned in here that he saw it through a

8  window or saw it in any other manner.

9  A.    Just cuz it don't appear on the report doesn't mean that

10  that's what was alerted to me by Officer Williams.  He's the

11  one that alerted me after placing Mr. Adams in the vehicle that

12  there was a weapon in plain sight or he discovered a weapon in

13  the vehicle.

14  Q.    And you had not seen this weapon.  You say it was just

15  sitting on the passenger seat?

16  A.    When I opened up the door, it was in plain view within

17  arm's reach laying in the front right seat.

18  Q.    And this is after the two to three minutes of not

19  stopping, pulling over, he's been left in the vehicle.  How

20  long was he left in the vehicle while you were running his

21  information?

22  A.    I cannot recollect.

23  Q.    Several minutes?

24  A.    I cannot recollect.

25  Q.    We got a lot of pictures or we got a few pictures of the

CROSS - AARON EDWARD WINDSOR

1    items that you allegedly found in the vehicle.  I did not see a

2    picture of where this gun was sitting.  Did you take a picture

3    of where the gun was allegedly sitting in the vehicle?

4    A.    No.

5    Q.    Who took those pictures?

6    A.    The four pictures that shows -- well, that you seen on the

7    last picture and so forth, I took those pictures.

8    Q.    Okay.  Okay.  But you didn't take the picture of where it

9    was?

10   A.    No.

11           THE COURT:  So when Officer Williams came back and

12   said, "Hey, there's a gun in the car," had he already retrieved

13   the gun?

14           THE WITNESS:  No, he left it.

15           THE COURT:  Right where it is?

16           THE WITNESS:  I am very particular on my traffic

17   stops.  Nobody touches that vehicle.  And then after I'm done

18   if I need a secondary search by another fresh set of eyes, I

19   may require another officer to check the vehicle.

20           THE COURT:  So you actually laid eyes on where it

21   was?  It's not just --

22           THE WITNESS:  He pointed it out, Your Honor.

23           THE COURT:  Okay.  Okay.

24   BY MR. HANLEY:

25   Q.    But you did testify earlier you didn't see it when he --

CROSS - AARON EDWARD WINDSOR

1    when he alerted you to the gun?  You didn't see under what

2    circumstances that was?  You were preoccupied with my client at

3    that time?

4              THE COURT:  You don't know how he saw the gun?

5              THE WITNESS:  Exactly, Your Honor.

6    BY MR. HANLEY:

7    Q.    You don't know if he opened the door?

8    A.    No.  Well, let's put it this way.  I didn't hear no door

9    opening.  I will say that because I would have immediately

10   turned around.  I would have said, "Hey, get the heck fire away

11   from my crime scene."

12   Q.    Okay.  So you didn't see it.  The marijuana --

13   A.    Uh-huh.

14   Q.    -- the bag was visible, but it was in an outer white bag;

15   right?

16   A.    Yes.

17   Q.    And that bag was tied and closed?

18   A.    It was in a bag.

19   Q.    It was a bag tied and closed?

20   A.    You'd have to look.  I'd have to look at those pictures

21   again.

22   Q.    Okay.  You don't recall?

23   A.    I'd have to look at the picture again how it was -- I

24   mean, in reference to that marijuana.  All I'm saying is that

25   there was a bag that was noticed, and, with that, the contents

CROSS - AARON EDWARD WINDSOR

1   within contained a green leafy substance at the place

2   indicated.

3   Q.   All right.  Did you discover the marijuana?

4   A.   Yes.

5   Q.   You don't have an independent memory of whether it was

6   open or closed when you discovered it?

7   A.   Not that I can recollect.

8   Q.   The pictures were taken after you opened -- you got into

9   the bag and discover the marijuana; right?

10  A.   Yes.

11          Your Honor, so there's no miscommunication, somewhere

12  along the line, I took a picture of the contents of it.  I

13  can't recollect whether it was open, closed.  Upon finding what

14  was inside, I took a picture.

15          THE COURT:  Okay.  Did you ever see my client's

16  girlfriend somewhere on the scene?

17          THE WITNESS:  Correction.  When I was told that the

18  vehicle could be released to her, that's when, okay, I seen

19  her.

20          MR. HANLEY:  If I could have just one second, Judge,

21  to tidy up.

22          THE COURT:  Okay.

23  BY MR. HANLEY:

24  Q.   Do you recollect -- do you remember seeing Officer

25  Williams go and speak to my client's girlfriend as soon as he

REDIRECT - AARON EDWARD WINDSOR

1  got on the scene?

2  A.   I don't recollect anything in reference to her being on

3  scene based upon I was inventorying the vehicle.  I don't

4  remember him -- nobody ever engaging her.  I never saw her on

5  scene.  I don't recollect having a conversation with her at any

6  point saying get away from my crime scene and all this other

7  stuff.  I was inventorying the vehicle.  I was taking pictures.

8  I was processing evidence.  I was trying to put it in a safe

9  secure area so it would not lose the chain of custody.

10          MR. HANLEY:  That's all I have, Judge.  I would move

11  to admit my exhibits.  I don't need to do B, but I do need to

12  admit C, the officer's report.

13          MR. ANDERSON:  That's the report.  Yeah, that's fine.

14          THE COURT:  It's admitted.

15          THE WITNESS:  Yeah.

16      [Defense C was received in evidence.]

17          THE COURT:  Do you have any follow up?

18          MR. ANDERSON:  Yes, Your Honor.  Just briefly.

19                      **REDIRECT EXAMINATION**

20  BY MR. ANDERSON:

21  Q.   When do you first recall your supervisor being on the

22  scene?

23  A.   Sir, I don't remember.  Like I said, there is -- when you

24  have a scene like that and there's multiple people there, my

25  focus was not on who else showed up because I had back-up.  I

REDIRECT - AARON EDWARD WINDSOR

1   was focused on what I needed to do for the inventory to make

2   sure everything was done right.

3   Q.   Do you recall when you first remembered your supervisor

4   being there?

5   A.   Toward the end when I was engaged in reference about

6   releasing that vehicle.

7   Q.   Okay.  But you had already conducted an inventory of the

8   vehicle at that point?

9   A.   Yeah, yeah.

10  Q.   Okay.

11  A.   That included the --

12          MR. ANDERSON:  No further questions.

13          THE WITNESS:  Okay.

14          THE COURT:  Okay.  Thank you, sir.

15          THE WITNESS:  God bless you.

16          MR. ANDERSON:  Your Honor, the United States calls

17  Officer Chase Williams.

18          Your Honor, may I reliever Officer Windsor?  I don't

19  intend to call him.

20          MR. HANLEY:  Wait a minute, Judge.

21          THE COURT:  Wait, wait.  Mike.

22          MR. HANLEY:  Mike, let's hold off through this

23  witness.

24          MR. ANDERSON:  Okay.

25          THE COURT:  Officer Williams, if you'll come

1   approach, please.  Raise your right hand.

2                       **CHASE WILLIAMS,**

3          **having been first duly sworn, testified as follows:**

4             THE COURT:  Please be seated.

5                     **<u>DIRECT EXAMINATION</u>**

6   BY MR. ANDERSON:

7   Q.   For the record, would you please state your name and where

8   you are employed?

9   A.   Officer Chase Williams with the Prichard Police

10  Department.

11  Q.   Back on January the 16th of this year, were you called

12  to assist Officer Aaron Windsor at a vehicle stop?

13  A.   Yes, sir, I was.

14  Q.   Can you tell the judge why you were called to the scene?

15  A.   Yes, sir.  We were -- Officer Windsor requested back-up

16  once he was notified through our dispatch that the suspect had

17  a -- excuse me -- had an active felony warrant.

18  Q.   When you received that radio call, do you recall how long

19  it took to get -- do you have any idea how long it took for you

20  to get there?  Was it quick, or did it take a long time?

21  A.   I believe roughly under a minute, sir.

22  Q.   Okay.  When you arrived on the scene in your vehicle,

23  where did you place your vehicle?

24  A.   So Officer Windsor's vehicle was directly behind the

25  suspect's vehicle.  I parked mine kind of --

DIRECT - CHASE WILLIAMS

1   Q.   Would it have been in it the roadway?

2   A.   Yes, sir, at an angle, you know, towards the driver's

3   vehicle, kind of blocking that other lane of travel.

4   Q.   Okay.  So you, in effect, are blocking the roadway at this

5   point?

6   A.   Yes, sir.

7   Q.   Would it be on the driver's side of the vehicle?

8   A.   Yes, sir.

9   Q.   What did you do at that point?

10  A.   At that point, I stepped out.  Myself and Officer Windsor

11  then gave the commands to -- for the driver to step out, and we

12  then took him into custody.

13  Q.   When you say "take him into custody," what happens when

14  you take an individual into custody?

15  A.   Sir, we give the -- give them commands that he step out of

16  the vehicle.  We get him to walk towards us with his hands up

17  so we can, you know, do everything as safely as possible.  We

18  then place them in handcuffs and then a pat-down is made for,

19  you know, officer safety, and then we place them in the

20  vehicle.

21  Q.   And did that happen in this case?

22  A.   Yes, sir.

23  Q.   All right.  After Justin Williams was placed in the

24  vehicle on that night on January the 16th, what did you do

25  then?

1   A.    Yes, sir.  At that point I began the initial vehicle

2   inventory because, at that point in time, we were going to

3   start towing the vehicle.  Officer Windsor had already

4   requested that, for a wrecker to come.  So then we started the

5   search of the vehicle due to the -- excuse me -- due to the

6   fact that we were gonna tow it.

7   Q.    Okay.  So did you hear Officer Windsor request a tow?

8   A.    Yes, sir.

9   Q.    Okay.  When you say you initiated the initial inventory of

10  the vehicle, what did you do when you walked up to the vehicle?

11  Tell the judge what you did.

12  A.    Yes.  Yes, sir.  So at that point I started -- I started

13  to approach the passenger side of the vehicle because that's

14  where I normally start as a secondary officer.  I normally let

15  the primary officer start on the driver's side.  So I

16  approached the passenger side of the vehicle.  At that moment

17  in time before even opening, you know -- before even opening

18  the door, I noticed sitting right there on the passenger seat

19  in plain view on the seat is a firearm.

20  Q.    Okay.  You didn't open the door?

21  A.    No, sir.  It was -- you could see it straight through the

22  window.

23  Q.    All right.  Do you recall if the window was up or down?

24  A.    No, sir.  I do not recall that.

25  Q.    All right.  But you didn't even touch the door?

DIRECT - CHASE WILLIAMS

1  A.   No.

2  Q.   Okay.  When you saw the weapon, what did you do?

3  A.   At that point in time, I immediately notified the primary

4  officer in the case of the firearm, and at that point I stepped

5  aside and let him, you know, notify dispatch of the firearm and

6  then run it to see if it was stolen.

7  Q.   Okay.  At that time were there any other -- if you recall,

8  do you recall if there were any other back-up officers at that

9  point at the scene?

10 A.   No, sir.  I believe at that time it was just myself and

11 Officer Windsor.  Shortly, a few moments prior to that, some of

12 the other officers then got there.

13 Q.   Okay.  A few moments prior to or after --

14 A.   I'm sorry.  Sorry.  Sorry.  A few moments after the

15 initial, you know, search of the vehicle, our supervisor showed

16 up on scene.

17 Q.   All right.  Did you see any other people around the

18 vehicle whenever you and Officer Windsor were -- were taking

19 Mr. Adams into custody?  Were there any other people present?

20 Were there any other civilians present?

21 A.   I don't remember any others present.

22 Q.   When you walked up and looked in the vehicle and saw the

23 firearm, were there any other people present?

24 A.   Oh, no, sir.  The vehicle -- the vehicle was only occupied

25 one time by the driver.

CROSS - CHASE WILLIAMS

1  Q.   Okay.  If you recall, I don't know if you recall, when

2  Officer Windsor started looking through the vehicle and doing

3  an inventory of the vehicle, do you recall if there were any

4  other civilians, any other people in the area or any other

5  people around the car?

6  A.   No, sir.  I do not recall anybody else being there besides

7  us two at that point.

8       MR. ANDERSON:  Okay.  No further questions, Judge.

9       THE COURT:  Mr. Hanley.

10                    **CROSS-EXAMINATION**

11 BY MR. HANLEY:

12 Q.   Yes.  So, to your recollection, you believed the tow truck

13 was called before you saw the gun?

14 A.   Yes, sir.  Once we had custody of the subject in question,

15 we -- he then started the wrecker, and that's when we started

16 our search.

17 Q.   Okay.  And that is why you approached the vehicle was to

18 conduct an inventory search pursuant to that; is that what you

19 are saying?

20 A.   That, and also to finish clearing the rest of the vehicle,

21 to make sure there were no other occupants inside, yes, sir.

22 Q.   Now, when you first pulled up on scene, it was just that

23 gentleman that was here earlier.  He was the only one as far as

24 police officers; right?

25 A.   Yes, sir.

CROSS - CHASE WILLIAMS

1    Q.    Well, didn't you see at that time that he was also --

2    there was a lady kind of out in the parking lot on the road

3    that was real upset that you approached and talked to?

4    A.    No, sir.  I don't recall that.

5    Q.    You don't recall that?

6          Okay.  Do you recall ever seeing a female on-site

7    that said and told you that she was my client's girlfriend?

8    A.    Yes, sir, towards -- further into the stop, I do remember

9    a female.  Yes, sir.

10   Q.    And you spoke to her?

11   A.    I don't remember speaking to her.

12   Q.    All right, Judge.  I just had a question that -- the

13   wrecker never showed up on scene, did it?

14   A.    No, sir.

15   Q.    And do you know who took the vehicle ultimately?

16   A.    I believe the female that you are referring to, the

17   vehicle was released to her due to our sergeant, you know, kind

18   of -- our sergeant advising us that, you know, it was a

19   family -- either a family vehicle or something she needed for

20   work or something to that extent.

21   Q.    When you arrived on scene, where was my client?

22   A.    When I arrived on scene, he was in the driver's seat of

23   the car.

24   Q.    Smoking a cigarette?

25   A.    I'm not sure if he was smoking a cigarette or not.  I know

```
1   he was in the driver's seat of the car at that time.

2            MR. HANLEY:  I don't have anything else, Judge.

3            MR. ANDERSON:  Nothing further, Your Honor.

4            THE COURT:  All right.  Thank you, sir.

5            MR. ANDERSON:  May Officer Williams be released?

6            MR. HANLEY:  Yes.

7            MR. ANDERSON:  Can we release Officer Williams?

8            THE COURT:  What about Windsor?

9            MR. HANLEY:  I'm okay with both of them being

10  released.

11           MR. ANDERSON:  Will you tell Windsor he can go as

12  well.

13           MR. HANLEY:  Do you have anybody else?

14           MR. ANDERSON:  Your Honor, at this time the United

15  States has no further witnesses.

16           THE COURT:  Okay.  Do you have a witness?

17           MR. HANLEY:  I do, Judge.  I first call Ms. Sheila

18  Williams Brown, Sheila Brown Williams.  I'm not sure what she

19  goes by.

20           Judge, may Ms. Williams come up?

21           THE COURT:  Hold on one second.  She's having to get

22  me --

23           THE CLERK:  My computer died.  Excuse me one second.

24  Let me use this one.

25           THE COURT:  Hold on one second.
```

1          I had recalled that I had received a letter from --

2   is this Ms. Sheila?  Is this Sheila?

3          MR. HANLEY:  Yes.  Yes, ma'am.

4          THE COURT:  Okay.  And I was concerned that she might

5   testify about something that might incriminate her.  You don't

6   represent her, so I need to ask her.

7          What's your last name, ma'am?

8          MS. WILLIAMS:  It's Williams.  I never changed my

9   I.D.  When my divorce came through, I never changed my name.

10          THE COURT:  Okay.  I think you wrote me under Sheila

11   Brown?

12          MS. WILLIAMS:  Yes, ma'am.

13          THE COURT:  Have you ever been convicted of a crime

14   of any kind?

15          I want her at the podium.

16          Okay.  Have you ever been convicted of any type of

17   crime?

18          MS. WILLIAMS:  Yes, ma'am.

19          THE COURT:  Okay.  Do you know what it was?

20          MS. WILLIAMS:  One of them was an assault.

21          THE COURT:  An assault?

22          MS. WILLIAMS:  Yes, ma'am.

23          THE COURT:  Okay.

24          MS. WILLIAMS:  I think one may have been like a

25   traffic ticket or something, but I didn't go to court on it or

1   anything.  They pulled me over.

2            THE COURT:  Oh, gosh.  Nobody reminded me about this

3   letter, and, now, I'm kind of concerned about her testifying

4   because if she testifies to what's in the letter, I don't know

5   what her conviction was for, and it could incriminate her.

6            MR. HANLEY:  I see that now, Your Honor.

7            THE COURT:  Did you have a permit for -- well, that's

8   also -- don't answer that question either.  I need an attorney

9   for her before I can let her go forward to testify unless you

10  can limit what you plan for her to say.

11           Is there anything else going on?  Is there any of the

12  public defenders going on in one of the other courts?

13           Ms. Brown I'm just going to talk to you at sidebar

14  right up here.  Just come up here.  I'll talk to you for a

15  minute.

16       [Bench conference on the record with Ms. Williams present,

17       reported but not transcribed herein.]

18       [Page 62, Lines 20 to Page 63, Line 8 left intentionally

19       blank to retain pagination.]

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9          [In open court.]

10          THE COURT:  I'm going to see if we have somebody in

11   the courthouse that maybe can give her some advice.

12          [Recess.]

13          THE COURT:  So I have located Tom Walsh in another

14   courtroom, and he'll be finished in about five minutes.  So we

15   are going to take a recess, and we are going to get him up

16   here.  And, Ms. Brown, if you'll stay in the courtroom, and,

17   when he gets here, I will -- let him talk to me first, and then

18   I'll -- we'll go forward after that.  I think that's the best

19   way to proceed.

20          And I'm sorry.  I had forgotten about this letter,

21   and my clerk reminded me of it, and I would have normally had

22   somebody here already.  But we'll take care of it as soon as we

23   can.  So we are going to take a bit of a recess until Mr. Walsh

24   gets here.

25          [Recess.]

```
1              THE COURT:  All right.  Does she wish to go forward

2   and testify?

3              MR. WALSH:  Yes, ma'am.

4              THE COURT:  Is it going to be limited?

5              MR. WALSH:  It is.

6              THE COURT:  Is that with agreement of the U.S.

7   Attorney?

8              MR. ANDERSON:  That is with agreement of the U.S.

9   Attorneys Office.

10             THE COURT:  Go ahead and call your witness.

11             MR. HANLEY:  Sheila Brown Williams.

12             THE COURT:  And, Ms. Williams, if you have a question

13  on -- with your attorney, I'm going to let him sit right up

14  here in the jury box.  And if you have anything you want to ask

15  your attorney before you answer, you are welcome to do so.

16             If you'll come forward, Ms. Sheila, Ms. Williams,

17  rather.

18             You can sit right there in the jury box if you would

19  like.

20             Raise your right hand.

21                         SHEILA ANN WILLIAMS,

22        having been first duly sworn, testified as follows:

23             THE WITNESS:  Yes.

24             THE COURT:  If you'll have a seat right here, ma'am.

25             All right.  Go ahead.
```

DIRECT - SHEILA ANN WILLIAMS

<u>**DIRECT EXAMINATION**</u>

BY MR. HANLEY:

Q.   Ma'am, would you introduce yourself to the Court.

A.   My name is Sheila Ann Williams.

Q.   And, Ms. Williams, how do you know my client?

A.   He's my boyfriend -- well, fiancé.

Q.   Did y'all live together when he was not locked up and whatnot?

A.   Yes, sir.

Q.   And do you remember January 16th of this year, an incident when Justin was arrested?

A.   Yes, sir.

Q.   Okay.  I'd like to go through that a little bit.

A.   Okay.

Q.   Can you tell us when you first learned that there was trouble and how you first found out?

A.   He called me on the phone and said that the officers were pulling him over, and I immediately told him I'm on my way. And I called my mama.

Q.   Okay.  Well, let me ask you what time of day or night was this?

A.   It was nighttime.

Q.   And where were you?

A.   I was at home.  I had just came back.

Q.   And did he tell you where he was?

DIRECT - SHEILA ANN WILLIAMS

1   A.   He said he was right -- as soon as you right get there by

2   Viger, you are right where you are going to see me.  When I got

3   to Viger, I looked and saw the police officer.

4   Q.   I know you are nervous too, Sheila.

5   A.   Yeah, I'm kind of scared too.

6   Q.   I know you are super nervous.  We are going to take it

7   step by step.  Okay.  So were you at home when you got the

8   call?

9   A.   Yes, sir.

10  Q.   What is your address?

11  A.   [Redacted].

12  Q.   And did he tell you where he was?

13  A.   He said he was right there by Viger.

14  Q.   All right.  And what did you do in response to getting

15  that phone call?

16  A.   First, I started to strike out running, but, instead, I

17  turned around and called my mama and said, "Hey, hurry, come

18  and get me.  Jay just called and said they pulled him over."

19  Q.   And did your mom come get you?

20  A.   Immediately.

21  Q.   Where does she live?

22  A.   She used to live -- well, used to live at

23  [redacted].

24  Q.   Is that close to you?

25  A.   I can basically holler "hey" out of my back door.  It's a

DIRECT - SHEILA ANN WILLIAMS

1   lot of bushes.

2   Q.   How long did it take her to get to your house to get you?

3   A.   I would say about a good 30 seconds.

4   Q.   And had she just dropped you off in the car?

5   A.   Yes, we had just come back.

6   Q.   And did you understand that Justin was in your vehicle?

7   A.   Well, he called while I was up there and asked me where

8   the keys were.

9   Q.   Is he allowed to use your vehicle?

10  A.   Any time he like.

11  Q.   Now, did you and your mom go over where he was pulled

12  over?

13  A.   Yes, sir.

14  Q.   And how long did it take you to get there?

15  A.   About a good solid two minutes and a half.  We drove

16  pretty fast, especially when something is going on.

17  Q.   I'm going to show you what I've marked as Defendant's

18  Exhibit D.  Down here is [redacted address].  Does that fairly

19  and accurately represent where you are at?

20  A.   Yes, sir.

21  Q.   And up here at this intersection, close to Viger, is that

22  close to where you found Justin?

23  A.   Yes, sir.

24  Q.   Now, this is a Google Maps thing, but it says it's about a

25  mile, three minutes to get there.  Is that --

DIRECT - SHEILA ANN WILLIAMS

1   A.   I don't know how much a mile is.

2   Q.   Okay.  This was at 9:00 o'clock at night; right?

3   A.   Yes, sir.

4   Q.   No traffic?

5   A.   No traffic.  If it was, we went around it.

6   Q.   Were y'all taking any detours or anything, or did you go

7   straight over there?

8   A.   One straight shot.

9           MR. HANLEY:  And, Judge, while I'm thinking about it,

10  I would ask that my Exhibits B, C, and D be admitted.

11          THE COURT:  They are admitted.

12       [Defense B and D were received in evidence.]

13          MR. ANDERSON:  Was B admitted?

14          MR. HANLEY:  B is here.

15          THE COURT:  That was referenced earlier.

16          MR. HANLEY:  And C was the report of the officer.

17          THE COURT:  Right.

18          MR. HANLEY:  I just wanted to do that while I was

19  thinking about it.

20  BY MR. HANLEY:

21  Q.   Okay.  Sheila, so you said your mom drove you?

22  A.   Yes, sir.

23  Q.   Now, this intersection here, is this the intersection?

24  A.   Yes.

25  Q.   Of Turner that you found Justin at?

DIRECT - SHEILA ANN WILLIAMS

1   A.   Yes, sir.

2          MR. HANLEY:  Judge, can we mark on her screen there?

3          THE COURT:  Yes.

4   BY MR. HANLEY:

5   Q.   Okay.  Which direction did you come from?

6   A.   I came from down at the bottom.

7   Q.   Right here?

8          THE COURT:  If you would touch the screen.

9          THE WITNESS:  And I went up this way, and I spotted

10  Justin.  And my mom turned this way.  As soon as she turned,

11  she could see the officer here on the curb, and I could see

12  Justin is still in the vehicle smoking a cigarette.  So my mom

13  parked here up by my vehicle, and I hopped out.

14  BY MR. HANLEY:

15  Q.   Okay.  So when you pull up, how many police cars are

16  there?

17  A.   It's one.  What do they call it a Tahoe, a truck?

18  Q.   Just one vehicle?

19         MR. ANDERSON:  One police car?

20         THE WITNESS:  Yes, sir.

21  BY MR. HANLEY:

22  Q.   And where on this picture was that police car?

23  A.   He was -- as soon as I turning, he was directly as soon as

24  you turning, but he was on the right-hand side.

25  Q.   Can you try to give us a circle of where he was.

DIRECT - SHEILA ANN WILLIAMS

1    A.    I would say right along here directly on the corner.

2    Q.    Where was your vehicle that Justin was in?

3    A.    I would say right here.

4    Q.    And where did your mother end up parking her vehicle?

5    A.    Here.

6    Q.    So when you took a left-hand turn, you basically bypassed

7    the whole scene; right?

8    A.    Yes, sir.  Yes, sir.

9    Q.    And when you stopped, what did you do?

10   A.    I get out of my mom's car and stepped into the street on

11   the side where the oncoming traffic was coming.

12   Q.    Why did you do that?

13   A.    Because I wanted the officer to see me because I was kind

14   of scared because there was a lot going on with police and

15   stuff like that.  I just wanted him to know I was there.

16   Q.    You were wondering what?

17   A.    I just wanted him to know that I was there on the scene,

18   and I was kind of scared because of there's so much going on

19   with the officers, like I said.  So when I stepped into the

20   street, it's easier to see me.

21   Q.    Did you try to -- now, at this point where is Justin?

22   A.    He's sitting in the car smoking a cigarette.

23   Q.    In whose car?

24   A.    In our vehicle, the Chevy Outlander.

25   Q.    What seat is he in?

DIRECT - SHEILA ANN WILLIAMS

1    A.    He's in the driver's seat.

2    Q.    When you are out in the road, where was the officer?

3    A.    He was still in his truck looking on his computer.

4    Q.    You could see him in there?

5    A.    Yes, sir.

6    Q.    Did you try to get his attention?

7    A.    No, sir.  I just stood there.  I was scared to say

8    something.

9    Q.    Did at some point he seem to notice you?

10   A.    Yes, sir.

11   Q.    And how did you know that he noticed you?

12   A.    He got on the big intercom thing and yelled to get out of

13   the roadway and back into my vehicle.

14   Q.    And did you communicate back with him?

15   A.    I was yelled back and said, hey, we don't have to yell at

16   each other like that.  I want to let you know I'm here because

17   this is my vehicle.

18   Q.    All right.  At this point when you are talking to him, do

19   you see any other officers there?

20   A.    By the time I'm, like, walking out of the street, that's

21   when another car came from where Wilson Avenue and turns in and

22   they slant over like almost in front of my vehicle and not too

23   close to it, but diagonal to the police officer's van because

24   they were, like, behind each other.  And he comes out, and he

25   starts talking to me --

DIRECT - SHEILA ANN WILLIAMS

1    Q.   Well, let me ask you, did you actually see that vehicle

2    show up on the scene?

3    A.   Yes, I did.

4    Q.   And when that vehicle stopped, did the officer get out?

5    A.   He got out.

6    Q.   What did he immediately do?

7    A.   He immediately came to me, trying to calm me, asking me

8    what was going on.  And I was like, I was just basically

9    letting y'all -- the officer know you don't have to yell.  I

10   can hear and stuff like that.

11   Q.   Did you tell him who you were?

12   A.   I told him that this is my vehicle.  That's my boyfriend

13   back in the car.  He said I'm just trying to calm the

14   situation.  So before I could finish talking to him, that's

15   when I see Sergeant Watson come around.

16   Q.   Did you tell him why you were on the scene?

17   A.   I told him immediately.

18   Q.   What did you tell him?

19   A.   I noticed Sergeant Watson.  I feel he's a great guy.  I

20   told him, hey, this is my vehicle.  I'm just here to make sure

21   it don't get towed because I don't have money to pay to get my

22   car out of the impound.

23   Q.   Now, as you were talking to these officers, these two

24   officers that arrived afterwards, at this point where is

25   Justin?

DIRECT - SHEILA ANN WILLIAMS

1   A.    He's still sitting in the vehicle.

2   Q.    In your vehicle?

3   A.    Yes, sir.

4   Q.    Is he wearing handcuffs or anything like that?

5   A.    No, sir.

6   Q.    And where is the other officer that was very first on the

7   scene?

8   A.    The other officer was still in his truck and one was

9   standing right here maybe 5 feet from me and Sergeant Watson

10  was coming up.  But, by then, another guy come from the blind

11  side of me and had a police cruiser park in the middle of the

12  street behind me, like over by my mama's car, but in the

13  middle, in the turning lane.  And so when he comes up, he

14  starts talking to me.

15  Q.    So did you tell all these officers who you were and why

16  you were there?

17  A.    Every one of them.

18  Q.    And what did they do?  What did they say to you about it?

19  A.    They said nothing.  The other one that came up last said

20  he was just going to go back where he come from but that he's

21  on a call that he just had.  Sergeant Watson said he'll see

22  what he can do.

23  Q.    So, after you talked to them, where did those officers you

24  were speaking to go?

25  A.    That's --

DIRECT - SHEILA ANN WILLIAMS

1   Q.    What did they do?

2   A.    That's when Sergeant Watson goes back to the passenger

3   side of my car, and he opened up the door.  And, in the middle

4   of the process, the other gentleman, he was trying to, like,

5   get into the driver's side because, by now, the officer is

6   taking Justin out.  So there's one on the passenger and one on

7   the driver's side.  So I'm telling him hey --

8   Q.    Let's go back just a little bit, if we can, because now

9   we've got Justin out of the car.  When you were talking to the

10  officers initially when they first came on scene, was Justin in

11  your car or in the police car?

12  A.    He was in our car.

13  Q.    When you talked to the police, at what point was he taken

14  out of your car?

15  A.    By the older gentleman while the other two were talking to

16  me.

17  Q.    And did the police officers that were talking to you go

18  over and speak to the other officer?

19  A.    After they took Justin out of the car they did.

20  Q.    And what did you observe then after they took Justin out

21  of the car?

22  A.    They just started rambling through my car, and that's when

23  I asked, "Hey, why y'all tearing my car up like this?"  And

24  they said, "Well, this is a routine traffic stop.  This is what

25  we do."  I said, "But y'all got him out of the car, and I'm

DIRECT - SHEILA ANN WILLIAMS

1   just here to get my car.  I still want to know why you are

2   tearing it up."

3           THE COURT:  Wait.  So at this point you are right at

4   your car --

5           THE WITNESS:  No, ma'am.  I'm still in front.  I

6   could see them though as far as like I am to you.

7           THE COURT:  All right.  So you are standing like

8   right in front of your car?

9           THE WITNESS:  I'm standing behind my mama's car.

10           THE COURT:  Oh, you are standing behind your mama's

11   car?

12           THE WITNESS:  But in front of my car because we are

13   all pointed this way.

14           THE COURT:  Okay.  So the officers are starting to go

15   through your car?

16           THE WITNESS:  Yes, ma'am.

17           THE COURT:  Okay.  And you are yelling at them to

18   stop or something --

19           THE WITNESS:  I didn't ask them to stop.  I just

20   wanted to know why were they doing it.

21           THE COURT:  At this point was Officer Watson still

22   talking to you or had he left?

23           THE WITNESS:  He was one of the officers that was

24   helping search the car.

25           THE COURT:  Oh, okay.  So there were three officers

DIRECT - SHEILA ANN WILLIAMS

1  searching the car?

2          THE WITNESS:  I only saw just those two, Sergeant

3  Watson and the younger guy.

4          THE COURT:  Okay.

5          THE WITNESS:  The other guy that arrested Justin, I

6  never saw him touch my vehicle.

7          THE COURT:  Was there an officer back there with you

8  at the time?

9          THE WITNESS:  I guess -- after I kept telling them

10  over and over and over, "Hey, I just want the vehicle," and

11  they trying to calm me down, and they said all this is going on

12  and all this going out.  I said you have to think about us too.

13          THE COURT:  Get closer to the mic and speak slower.

14          THE WITNESS:  That's when the other officer that came

15  up from behind me.  He said, "You have got to understand we've

16  got to control the situation."

17          And I said, "You got to think about us.  We scared

18  too."

19          He noticed I had a pocketbook in my hand.  And he

20  said, "You coming up here with a pocketbook?"

21          I said, "What am I going to do with this pocketbook?

22  It's just a purse."

23          He said, "You could have anything in it."

24          Well, I said, "If I reach for this pocketbook,

25  someone is going blow my head off if I try to go in it.  So

CROSS - SHIELA ANN WILLIAMS

1    let's not be funny with each other."  And then he left.  He

2    went back on his cell phone.

3              THE COURT:  You don't know who that was, though?

4              THE WITNESS:  No.  He was a short black guy.  I know

5    that.

6              THE COURT:  Okay.

7    BY MR. HANLEY:

8    Q.   Okay.  And so had you informed these officers that that

9    was your vehicle that you were the registered owner and that

10   you wished to take it with you prior to them arresting Justin

11   and searching the vehicle?

12   A.   Yes, sir.

13             MR. HANLEY:  If I could just have one second, Judge.

14             I've got nothing further of this witness, Judge.

15             THE COURT:  Okay.

16                     **CROSS-EXAMINATION**

17   BY MR. ANDERSON:

18   Q.   So you just testified here today that you arrived at your

19   vehicle within three minutes of the phone call from your

20   boyfriend?

21   A.   Yes, sir.

22   Q.   Okay.  As a matter of fact, when you arrived there, there

23   was only one police car there?  There were no other police

24   cars, just one police car?  That's what you just testified to?

25   A.   Yes, sir.

CROSS - SHIELA ANN WILLIAMS

1    Q.    Okay.  And, when the other police cars arrived, you then

2    tell them that that's my car, don't -- you know, I want to take

3    that car.  I don't want the car towed.  That's what you've told

4    every police officer that was present on that scene?  That's

5    your testimony here today?

6    A.    It was my statement to them that it was my vehicle.  I

7    wasn't ugly with them.

8    Q.    But, before you came here today to testify, you talked to

9    Justin Lee Adams about your testimony here today; is that

10   correct?

11   A.    No, sir.

12   Q.    You have not talked to him at all?

13   A.    I talk to him every day.

14   Q.    You talk to him every day.  But you haven't talked any

15   about your testimony here today?

16   A.    The only thing I talked to about Justin is me venting

17   about the officers because I thought they were trying to lie

18   and trap him.

19   Q.    What?

20   A.    Lie and trap him into something.

21   Q.    So they are trying to lie because it's to their benefit to

22   lie about whatever happens to him; is that what you believe?

23              MR. HANLEY:  I'm going to --

24              THE WITNESS:  I'm not going to say --

25              MR. HANLEY:  I object.  I don't know the relevance,

CROSS - SHIELA ANN WILLIAMS

1    her beliefs.

2    BY MR. ANDERSON:

3    Q.    So you have talked to him.  And you talked to him every

4    day; is that correct?

5    A.    Yes, sir.

6    Q.    And you don't want to see him go to jail?

7    A.    I don't want to see him in there now.

8    Q.    Okay.  And it's your testimony that you talked to -- you

9    told Sergeant Williams that you didn't want your car towed?

10   A.    It's Watson.

11   Q.    Sergeant Watson.

12   A.    Yes, sir.

13   Q.    And you also saw Sergeant Watson searching through your

14   vehicle?

15   A.    Yes, sir, him and another young gentleman.

16   Q.    So you just testified that they were -- the police

17   officers were tearing up your vehicle, that you didn't want

18   them to tear up your vehicle.  What were they doing to tear up

19   your vehicle?

20   A.    I was asking them why were they tearing it up.  They were

21   not physically -- they were, like, rambling and rambling.  My

22   car is junky.

23   Q.    I can't hear you.

24   A.    My car is junky.  So when I say tearing it up, they were

25   throwing paper and cups maybe we left in there, maybe old sale

CROSS - SHIELA ANN WILLIAMS

1   papers and stuff.  That's tearing it up to me.  They were going

2   through it.

3           THE COURT:  I think she means rummaging is tearing it

4   up.

5           THE WITNESS:  Yeah, maybe I said it wrong.

6           MR. ANDERSON:  Okay.  Nothing further, Judge.  I've

7   got nothing else for this witness.

8           MR. HANLEY:  I've got one more, Judge.

9           THE COURT:  Thank you, ma'am.

10          THE WITNESS:  Thank you.  Y'all have a great day.

11          MR. HANLEY:  This will be Willie Mae English, Judge.

12          THE COURT:  If you intend to call her for trial for

13  any reason, Mr. Walsh --

14          You need to be in contact with Mr. Walsh if you

15  intend to call her at trial for other reasons.

16          MR. WALSH:  Yes, ma'am.

17          THE COURT:  Yes, ma'am.  Come on up, Ms. English.

18  Come on up, ma'am.  Come on up, ma'am.  If you'll raise your

19  right hand; this lady will swear you in.

20                          **WILLIE MAE ENGLISH,**

21      **having been first duly sworn, testified as follows:**

22          THE WITNESS:  I do.

23          THE COURT:  Yes, ma'am.  If you'll have a seat up

24  here for us.

25

DIRECT - WILLIE MAE ENGLISH

**<u>DIRECT EXAMINATION</u>**

BY MR. HANLEY:

Q.   Ma'am, would you introduce yourself to the Court?

A.   My name is Willie Mae English.

Q.   Ms. English, the lady that just went out of here, how do you know her?

A.   That's my daughter, Sheila.

Q.   And who is my client, Justin Adams, to you?

A.   My future son-in-law.

Q.   What's that?

A.   My future son-in-law.

Q.   Back on January 16th of this year, do you remember an incident where Justin was pulled over and arrested?

A.   Yes.

Q.   Can you tell me how you came to find out that something was going on that evening?

A.   My daughter and I and my granddaughter and my sister, we went to the casino, and I had went and dropped her off at home. And before I can pull in my driveway good, she called me back to tell me to come pick her up.  I said, "What's wrong?"

         She said, "The police done pulled Jay over."  And so I picked her back up, and we drove to where he was.

Q.   And what was that last --

A.   We drove to where he was.

Q.   You drove your daughter?

DIRECT - WILLIE MAE ENGLISH

1   A.   Yes, I had my own car.

2   Q.   How long did it take you?

3   A.   I'd say maybe about five minutes.  It didn't take me long.

4   Q.   And when you pulled on the scene, how many officers were

5   there?

6   A.   One.

7   Q.   How many police cars were there?

8   A.   One.

9   Q.   All right.  And what did you do when you pulled onto the

10  scene?

11  A.   I put it in park.  She got out and was walking back

12  towards where the police officer in that van was and asked what

13  was going on.

14  Q.   You said police officer in his van.  Is that what you

15  said?

16  A.   No, he was in her van.  Jason was in the van.

17  Q.   Okay.  So when you pulled up on scene, where was Justin?

18  A.   He was in the van smoking a cigarette.

19  Q.   All right.  In your daughter's vehicle?

20  A.   In her car, yes.

21  Q.   And what seat was he in?

22  A.   The driver's seat.

23  Q.   And you say he was smoking a cigarette?

24  A.   Yes.

25  Q.   Could you see where the officer was?

DIRECT - WILLIE MAE ENGLISH

1    A.    He was in the back in the car.

2    Q.    In his own police vehicle?

3    A.    Yes, yes.  He was doing something in there.  I don't know

4    what he was doing.

5    Q.    You didn't see any other police on the scene?

6    A.    Not right then.  They came later.

7    Q.    So what happened -- so your daughter gets out of the

8    vehicle.  She starts walking back there.  And what happened

9    then?

10   A.    She was asking them, trying to find out what was going on.

11   She asked them what was happening, what was going on.  And he

12   told her it was -- what you call a police routine -- a routine

13   check.

14   Q.    Okay.  Did you ever get out of the vehicle?

15   A.    No.  I never got out of my car.

16   Q.    All right.  And you are facing -- was your window down?

17   A.    Yes.  I had it down.

18   Q.    And you are facing -- you are the front of the three

19   vehicles all facing in one direction?

20   A.    Yes.  I pulled right in front.

21   Q.    So is most of what you were seeing through your mirrors

22   and whatnot --

23   A.    Yes.

24   Q.    -- looking back?

25            Did you ever hear an officer tell your daughter to

1    get out of the road over a loud speaker?

2    A.    Yes, he did.

3    Q.    Did you see when the additional officers showed up on

4    scene?

5    A.    Just the other cop pulled up beside the one that was

6    already there.

7    Q.    Okay.  You saw that happen?

8    A.    Yeah.  I seen that car pull up.

9    Q.    And did that officer talk to your daughter?

10   A.    He said something to her, but I don't know what.

11   Q.    Were they back behind your vehicle somewhere?

12   A.    The other car came that was behind in front my vehicle,

13   and the other one was behind me.  And the other two was behind

14   me.

15   Q.    Could you tell through your mirrors that your daughter was

16   having interactions with the police?

17   A.    All I just seen is they talking away, waving their hand.

18   I could tell she was saying something and waving her hand.

19   Q.    Is Justin still in the vehicle?

20   A.    He's still in the vehicle.

21   Q.    At some point did they take him out of the vehicle?

22   A.    Yes.  They took him out and put the handcuffs on him.

23   Q.    Was that after they talked to Sheila?

24   A.    Yes.

25   Q.    And what did they do after they put handcuffs on him?

DIRECT - WILLIE MAE ENGLISH

1    A.    They told her she could get her car now.  She worried

2    about somebody getting her car and towing it, and she didn't

3    have the money to go get it.  So they got him handcuffed and

4    told him he was being arrested.

5    Q.    Did you ever see them search her vehicle?

6    A.    They went in.  And what all they were doing, I have no

7    idea.  They went in on the passenger side.  She was trying to

8    tell one -- the other one how to open her door.

9    Q.    Okay.  So she was interacting with them during this

10   whole --

11   A.    Just talking.

12   Q.    During the time that they are searching the vehicle?

13   A.    Yeah, because she was trying to tell them how to open the

14   door.

15   Q.    Were they trying to force something open, and she was

16   basically trying to make sure nothing got broken?

17   A.    Yeah.  Her door was broke.  It was on the left-hand side.

18   He was on the driver's side on the passenger side of the car.

19   Q.    And what happened at the end of this?  How did this whole

20   evening end?

21   A.    They told -- I don't know what was said.  A few minutes

22   later, they told her she could get her car.

23   Q.    And did she drive it home --

24   A.    And he was going to be arrested.

25   Q.    Did she drive her car home?

1    A.    I trailed her home.  I didn't leave until she got her car,

2    and then I trailed her back home.

3              MR. HANLEY:  I've got nothing further, Judge.

4              MR. ANDERSON:  I don't have any questions, Your

5    Honor.

6              THE COURT:  All right.  Thank you.

7              THE WITNESS:  That's it?

8              THE COURT:  You're excused.  Thank you, ma'am.

9              THE WITNESS:  Okay.  Thank you.

10             THE COURT:  Anything else?  Any other witnesses for

11   you?

12             MR. HANLEY:  No, ma'am.

13             THE COURT:  Okay.  All right.  Well, this comes down

14   to a credibility issue, and I find that Officer Windsor's

15   testimony is credible as to his procedure that he used that

16   night.  He has a man that has felony warrants.  He waits for

17   back-up, and back-up gets there.  They take him out of the car.

18   They arrest him.

19             And then he goes to call the dispatch for the tow

20   truck, and it is after the gun is found that they do that.  And

21   he starts his inventory, as he is required to do, since he has

22   now called a tow truck.  He can't just release it to a tow

23   company.

24             And so I find that anything that was found during the

25   inventory search was legitimate and based on the inventory

1   search and not due solely just for investigative purposes.  So

2   your motion is denied.

3          I wanted to say one other thing.  Hold on a second.

4   Oh, and just for practical reasons, once the gun was seen in

5   plain view, until the scene is sorted out, there is no way that

6   the police officers were gonna allow this woman to be up there

7   and participating in the search and doing everything that she

8   said.  That's part of the reason why I didn't find her

9   testimony very credible.  They would have her away from the

10  scene.  And, once the gun was found, they are not going to be

11  releasing the car like, oh, okay, just take the car now while

12  there may be other guns in the car.  So the thought that they

13  could have just released it to her is not justified.  Anyway,

14  your motion is denied.

15         This is set for trial.  Anything else we need to take

16  up today?

17         MR. ANDERSON:  No, Your Honor.

18         MR. HANLEY:  No, Judge.

19         THE COURT:  Okay.  Thank you.

20     [Recess.]

21

22

23

24

25

INDEX OF EXHIBITS RECEIVED

|  | PAGE | LINE | VOL |
|---|---|---|---|
| Defense A . . . . . . . . . . . . . . . . . .12 | 20 | 1 |
| Defense B . . . . . . . . . . . . . . . . . .68 | 12 | 1 |
| Defense C . . . . . . . . . . . . . . . . . .52 | 16 | 1 |
| Defense D . . . . . . . . . . . . . . . . . .68 | 12 | 1 |
| Government 4 . . . . . . . . . . . . . . . .28 | 25 | 1 |

CHRONOLOGICAL INDEX OF WITNESSES

|  | PAGE | LINE | VOL |
|---|---|---|---|

**AARON EDWARD WINDSOR**

| DIRECT BY MR. ANDERSON: . . . . . . . . . .15 | 2 | 1 |
| CROSS BY MR. HANLEY: . . . . . . . . . . .31 | 2 | 1 |
| REDIRECT BY MR. ANDERSON: . . . . . . . . .52 | 20 | 1 |

**CHASE WILLIAMS**

| DIRECT BY MR. ANDERSON: . . . . . . . . . .54 | 6 | 1 |
| CROSS BY MR. HANLEY: . . . . . . . . . . .58 | 11 | 1 |

**SHEILA ANN WILLIAMS**

| DIRECT BY MR. HANLEY: . . . . . . . . . . .65 | 2 | 1 |
| CROSS BY MR. ANDERSON: . . . . . . . . . .77 | 17 | 1 |

**WILLIE MAE ENGLISH**

| DIRECT BY MR. HANLEY: . . . . . . . . . . .81 | 2 | 1 |

```
1   STATE OF ALABAMA)
                   :
2   COUNTY OF MOBILE)

3               UNITED STATES OF AMERICA
                       VS.
4                 JUSTIN LEE ADAMS
                CASE NO. CR21-00124
5

6        I, Melanie Wilkins, do hereby certify that the above

7   and foregoing transcript of proceedings in the matter

8   aforementioned was taken by me in machine shorthand on

9   August 11, 2021, and the questions and answers thereto were

10  reduced to writing under my personal supervision using

11  computer-aided transcription, and that the foregoing represents

12  a true and correct transcript of the proceedings upon said

13  hearing.

14

15       I further certify that I am neither counsel nor

16  related to the parties to the action, nor am I in anywise

17  interested in the result of said cause.

18  Dated:  August 19, 2021
    Pages:  1 to 89, inclusive
19

20

                          _____
21                        Melanie Wilkins
                          Registered Merit Reporter
22                        Certified Realtime Reporter
                          Official Court Reporter
23                        United States District Court
                          Southern District of Alabama
24                        113 St. Joseph Street
                          Mobile, Alabama  36602
25                        (251) 690-3371
```